## Palairet's Appeal.

| 67 | 479 |
| 181 | 413 |
| 67 | 479 |
| 23 SC | 37 |

1. Retrospective legislation is not of itself unconstitutional, except so far as it has an effect prohibited by the fundamental law.

2. An act which operates retrospectively to take what is by the existing law one man's and without his consent transfer it to another, with or without compensation, violates the Bill of Rights.

3. "The law of the land" means due process of law by which what one alleges to be his property is adjudged not to be his, or it is forfeited upon conviction by his peers of a crime for which by law it was subject to forfeiture when the crime was committed.

4. The right of eminent domain being for the safety and advantage of the public overrides all rights of private property.

5. The legislature with the executive is upon all questions of policy the exponents of the will of the people.

6. The Act of April 15th 1869 for extinguishment of ground-rents is unconstitutional.

February 14th 1871. Before Thompson, C. J., Agnew, Sharswood and Williams, JJ. Read, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Philadelphia*: No. 221, to January Term 1871.

The proceeding was commenced February 24th 1871, by a petition in the name of the Commonwealth, at the relation of John Ganser against John G. Palairet and others, trustees, &c., of Mary Ann Palairet, under the Act of April 15th 1869, Pamph. L. 1869, p. 47, Purd. 1570, which is as follows:—

"An Act to provide for the extinction of irredeemable rents.

[Palairet's Appeal.]

"Whereas, there were formerly reserved or created in Phila-
delphia and other parts of this Commonwealth, yearly rents,
which in their nature or by lapse of time are or have been irre-
deemable by the owners of the land whereout they issue; in con-
sequence whereof the power of such landowners to sell or mortgage
their land is greatly limited.

"And whereas, the policy of this Commonwealth has always
been to encourage the free transmission of real estate, and to
remove restrictions on alienation, so that it is and is hereby de-
clared to be necessary for the public use to provide a method of
extinguishing such irredeemable rents, having a due regard for
private rights: therefore,

"Section 1. Be it enacted, &c., That it shall be lawful for any
owner of land, on or out of which any irredeemable rent has been
charged or reserved, to apply by petition, in the name of this
Commonwealth, at his own relation, to the Court of Common Pleas
for the county in which such land shall be situated, for an order
on the owner of such rent, to show cause why a decree for the
extinguishment thereof should not be made on his being compen-
sated therefor, in the manner hereinafter provided; whereupon
the court shall cause a citation to issue to the owner of the rent,
according to the practice of the said court; and if he shall be
unknown, or not a resident of the said county, the court shall
cause notice to be given to him by advertisement, as they shall
deem advisable, and the notice so given shall be deemed and taken.
to be actual service for all purposes.

"Section 2. On the return of such citation, or after publica-
tion as aforesaid, if the owner of the land and the owner of the
rent do not agree on the terms on which the former shall be allowed
to purchase the rent, then the court shall cause a venire to issue,
directed to the sheriff, requiring him to summon a jury of twelve
disinterested freeholders of the county, who shall assess and de-
termine the damages which the owner of the said rent will suffer
by the compulsory extinction of the same, which shall not be esti-
mated at less than twenty years' purchase thereof; and the dam-
ages being so assessed, and the inquest confirmed by the court, it
shall be lawful for the owner of the land to pay or tender to or
for the use of the owner of the rent, in such manner as the court
shall direct, the sum so found, together with all the costs of the
proceedings; and whereupon the court, upon due evidence of such
payment or tender, shall enter a judgment that the said rent shall
thenceforward be taken to be extinguished, and no action there-
after for the recovery thereof shall be brought in any court of
this Commonwealth.

"Section 3. If such rent shall be held wholly or partly by any
person under any disability, or absent from the country, or by
persons for successive estates, or on trust, then the court shall

[Palairet's Appeal.]

have all such power to direct in' what way the said damages, so assessed, shall be tendered, paid or secured, as a court of equity could have in the premises; and if the owner of the rent shall be unknown, then the money shall be paid into court, to be invested in the loan of this Commonwealth to the use of such owner; and if no claimant shall appear therefor within the space of ten years thereafter, such loan shall be transferred by the state treasurer to the sinking fund provided by law. * * *

"Section 5. That if the petitioner in any such case shall, after the confirmation of the return of the inquest, fail for the space of three months to pay or tender the damages and costs aforesaid, according to the directions of the court, it shall be lawful for the court thereupon, at the option of the respondent, to enter a judgment for the payment of such damages and costs by the petitioner, to be enforced by execution, as other judgments in the said court, or else to dismiss the petition, and vacate the proceedings thereon at the petitioner's costs."

The petition set forth that the relator was seised of two lots of land in Philadelphia, subject to three irredeemable ground-rents, which are now owned by J. G. Palairet and others, trustees above named.

The petition prayed for—

An order and citation against the defendants to show cause why a decree for the extinguishment of the above-named ground-rents should not be made, upon their being compensated therefor, according to the terms and in the manner set forth in the above Act of Assembly.

The answer of the defendants admitted that they were seised of the three irredeemable ground-rents, as stated in the petition, and submitted to the court that their title to the said three yearly ground-rents, so held by them in trust, could not be divested or taken away from them, unless the same should be required by the Commonwealth for public use, in exercise of her right of eminent domain; and that where no public right is involved, and the question was merely between the said John Ganser, as owner of the property, and themselves, as the owners of an estate or encumbrance thereon, no act of the legislature could divest, or at all affect their right or title in and to the same.

After argument the Court of Common Pleas decreed the extinguishment of the ground-rents, Ludlow, J., delivering the following opinion:—

"Upon the 15th day of April 1869, the legislative department of the government of Pennsylvania, with the approval of the executive of the Commonwealth, declared in the most formal manner, that the policy of the state, which has always encouraged the free transmission of real estate and removed restrictions upon alienation, required the absolute extinguishment of irredeemable

17 P. F. Smith—31

rents, and thereupon because of a public necessity, which existed, and for the public use, a method is provided by which these rents may be extinguished, only, however, upon due notice to all parties interested, and upon ample compensation being awarded, which ' shall not be estimated at less than twenty years' purchase thereof.' Is this act constitutional ? That question can be determined only by the judicial department of the government, and in order to settle it the petition and answer have in this case been filed, and this Act of Assembly must now receive a judicial construction. It may be noticed, in passing, that the preamble of the law is not the law itself; it, however, serves a useful purpose, because it explains the object and intention of the legislature, and we may therefore safely affirm, that the legislature intended to accomplish an act, not for private ends, but for the public good; reasons of state policy affecting the masses of the people led to the passage of the act, and the governor must have concurred in the views entertained by the legislature, for he gave his official approval to the act.

" Here, then, is the exercise of the right of eminent domain, and because it embraces a class of cases of a peculiar nature, challenges our careful consideration.

" It cannot be denied that a cursory view of this legislation inclines one to reject it as unconstitutional; first, because it divests a vested estate; and secondly, because it appears to violate that cardinal doctrine of our organic national law, which declares that a contract is a sacred thing, and when once made shall not be destroyed; this view, however, will either be very seriously shaken, or wholly changed. by a more deliberate examination of the subject. Jurists and other writers have based the origin of the right of eminent domain upon various grounds; one calls it the ' transcendental right;' another declares that title to all real estate is so vested in the Commonwealth, that the right to use and enjoy exists, only subject to the paramount authority of the state; but, after all, we think the true origin of this right, as well as the occasion for the exercise of it, depends upon that public and overwhelming necessity which compels the supreme power, for the welfare of the entire community, to enact laws which, in particular cases, work hardships to individuals, but which must inevitably benefit the public. Property may, therefore, be taken, but never without paying to the owner thereof just compensation. What but a political necessity justified the legislature of Pennsylvania, on the 27th day of November, A: D. 1779, in enacting what was called ' The Divesting Act,' by virtue of which the descendants of the founder of the Commonwealth lost their proprietary rights in this Commonwealth ? The constitutionality of that act has never, to our knowledge, been questioned, nor could it be successfully, for public policy required just such legislation, in order to adapt

the laws of the land to the altered political condition of the people. Even in England, the old tenures have, one after the other, given way before the progressive ideas of enlightened jurists and statesmen, and although the principles flowing from these tenures are so interwoven into the very fibre of the law that they cannot be eradicated, yet the fact remains unshaken that public policy required these changes to be made. They are going on even to this day. A wise policy has, in this Commonwealth, destroyed estates in fee tail, and thereby enlarged estates, and has also declared that no interest in property, real or personal, shall exist beyond a specified period of time. Land has been taken by the supreme power for various purposes; we may mention, by way of illustration, the fact, that ferries have been established, mills erected, railroads built and public parks created, because of a necessity which was imperative.

" This necessity has been sometimes political, sometimes social, but has always existed, and the exercise of the power of the Commonwealth has always involved and prompted the convenience and welfare of the people.

" The title of the founder of the Commonwealth and his descendants could not exist in a republican Commonwealth. The existence of estates in tail and of estates created in perpetuity, destroyed the symmetry of our system of government; and while on the one hand the legislature and the courts swept away these clogs to the free alienation of land and the enjoyment of estates on the other, whatever was necessary for the public good was taken (subject to the right of compensation), as the wants of an increasing population rendered it necessary.

" Does a necessity now exist which requires the destruction of irredeemable rents ?

" The question will be best answered by considering the nature of the rents, and the result which flows from the fact that they are irredeemable. A ground-rent is a rent service; it has always been treated as real estate, and, being irredeemable, creates an estate in perpetuity with this peculiar feature, that a sale for arrearages relates back to the date of the deed, and destroys the lien of subsequent encumbrances.

" Can it be wondered at that a property subject to an irredeemable rent can neither be freely alienated, improved nor encumbered ? An irredeemable rent clings like a barnacle, and when numbers exist (as is the case in this country), it becomes no longer a question involving the rights of individuals, but one which affects the public interests, because their existence paralyzes individual effort and thereby hinders the creation of enterprises which develop the wealth of the Commonwealth, unjustly puts in jeopardy the estates of individuals by reason of sales for arrearages not

known to exist, and especially destroys the hope of improvement and the free alienation of real estate.

"While the legislature have not interfered with that which was valuable, they have from time to time removed the evils of the system, and by the Act of 1869 have finally destroyed that species of property, the existence of which was found to be incompatible with the genius of our free institutions, and the healthy and vigorous growth of our system of social and political economy."

The respondents appealed to the Supreme Court, and assigned the decree of the Court of Common Pleas for error.

*G. W. Biddle* and *W. H. Rawle*, for appellants.—It is the province of the courts, not of the legislature, to interpret the words "public use," in the Constitution: The West River Bridge Co. v. Dix, 6 How. 529; Pittsburg v. Scott, 1 Barr 314; Keeling v. Griffin, 6 P. F. Smith 307. The purpose for which this act authorizes the taking of property is not a public use. In order to justify the taking of property under the right of eminent domain, it must be taken and held by the state or its grantee, subject to the state's control, and for specified public uses, which the public has a legal right to enforce: Osborn v. Hart, 24 Wisconsin 89; Whiting v. The Sheboygan Railroad, 9 Amer. Law Reg. (March 1870) 156; People v. Salem, Id. 487; Ladlee v. Langham, 34 Ala. 311; Varick v. Smith, 5 Paige 159; People v. Palatine, 53 Barb. 70. Only where the public use expressed in the grant attaches to the whole of the property taken under it, so as to give the public immediate, compulsory and paramount rights over it, in the hands of the grantee, can the right of eminent domain support the grant: East St. Louis v. Louisiana St. John, 47 Ill. 463; Jones v. Tatham, 8 Harris 393; Smedley v. Erwin, 1 P. F. Smith. 451; Jessup v. Loucks, 5 Id. 361; Ervine's Appeal, 4 Harris 256; Norman v. Heist, 5 W. & S. 174.

*H. Wharton*, for appellee.—The objection that the act divests vested rights is not sound: Grim v. Weissenberg, 7 P. F. Smith 435; Durach's Appeal, 12 Id. 491; Bambaugh v. Bambaugh, 11 S. & R. 191; Price v. Taylor, 4 Casey 95; Criley v. Chamberlain, 6 Id. 167; License Cases, 5 How. (U. S.) 589, 632; Blaise v. Freeland, 100 Mass. 140; Price v. Maxwell, 4 Casey 23; Miller v. Porter, 3 P. F. Smith 292; Cooley on Constitutional Limitation 358.

This act is to accomplish a public object, and is therefore not taking the property of one man to give it to another: Concord Railroad v. Greeley, 17 N. H. 57; Dingley v. Boston, 100 Mass. 544; Fiske v. Framington Manuf. Co., 12 Pick. 68; Boston and Roxbury Mill Dam Corporation v. Newman, Id. 489; Hagen v.

[Palairet's Appeal.]

Essex County, 12 Cush. 477; Olmstead *v.* Camp, 33 Conn. 532; Burgess *v.* Clarke, 13 Ired. 109. Lateral railroads are created on the same principle. The constitutionality of the laws creating them is upheld in Harvey *v.* Thomas, 10 Watts 63; Harvey *v.* Lloyd, 3 Barr 331; Schoenberger *v.* Mulhollan, 8 Id. 146; Hays *v.* Risher, 8 Casey 169; Brown *v.* Corey, 7 Wright 495.

If the use is of a public nature, the legislature are the sole judges whether it is sufficiently beneficial to warrant taking private property for it: In the Matter of Townsend, 39 N. Y. 171; Beckman *v.* Saratoga Railroad, 3 Paige 73.

The right of eminent domain extends to every species of property, land, franchises and contracts of all kinds: West River Bridge Co. *v.* Dix, 6 How. 507; Mills *v.* St. Clair County, 8 Id. 569; Richmond, &c., Railroad *v.* Louisa Railroad, 13 Id. 71; Matter of Kew, 42 Barb. 119; and cases in note to page 526 of Cooley on Constitutional Limitations.

The opinion of the court was delivered, May 8th 1871, by

SHARSWOOD, J.—Retrospective legislation is certainly not in itself unconstitutional, unless so far as it has an effect prohibited by the fundamental law. If, however, an Act of Assembly, whether general or special, public or private, operates retroactively to take what is, by existing law, the property of one man, and, without his consent, transfer it to another, with or without compensation, it is in violation of that clause in the Bill of Rights, Const., Art. IX., sect. 9, which declares that no man "can be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." If this is true of a person accused of crime, to whom literally the words are applied, *à fortiori* is it so as to one against whom no accusation is made. By the "law of the land," is meant, not the arbitrary edict of any body of men—not an Act of Assembly, though it may have all the outward form of a law—but due process of law, by which either what one alleges to be his property is adjudged not to be his, or it is forfeited upon conviction by his peers of some crime, for which by law it was subject to forfeiture when the crime was committed. If this be not so, every restriction upon legislative authority would be a vain formula of words, without life or force. For what more can the citizen suffer than to be "taken, imprisoned, disseised of his freehold, liberties and privileges; be outlawed, exiled and destroyed; and be deprived of his property, his liberty and his life," without crime? It will not have escaped notice that in the clause of the Constitution referred to, property is put in the same category with liberty and life, and if an Act of Assembly can deprive a man of his property, without a trial and judgment for even legal cause of forfeiture, it may in like manner deprive him of his life or his liberty, imprison him in a

dungeon or hang him without judge or jury. It is true that there are other more special declarations which give additional securities to liberty and life, but by classing all three together in this provision of the fundamental law, the people have declared their equal inviolability. There are also other special provisions as to security of property—adapted to the dangers with which in a democratic form of representative government it is more especially threatened. But neither those clauses which relate to life and liberty, nor those which regard property, weaken the power of this grand primary inhibition, which the sturdy barons of England, arms in hand, wrested from their sovereign at Runnymede, *Nullus liber homo capiatur vel imprisonetur aut disseisiatur de libero tenemento suo vel libertatibus vel liberis consuetudinibus suis, aut utlagetur, aut exuletur, aut aliquo modo destruatur; nec super eum ibimus, nec super eum mittemus, nisi per legale judicium parium suorum vel per legem terræ.* This is still the corner-stone of our liberties. It becomes us to watch it with the greatest vigilance—not to suffer it to be undermined on any pretext, however specious. To this the most solemn sanction of our official oath applies with the greatest force, for while other parts of the Constitution may be merely directory, the people have most solemnly and emphatically said as to the 9th article, "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government, and shall for ever remain inviolate."

It has become, then, a fundamental axiom of constitutional law, not only in this, but in every other state of this Union, that the legislative power cannot, either directly or indirectly, without the consent of the owner, take private property for merely private use, with or without compensation. In a case arising in Rhode Island, which, without a written constitution, except her charter of 15 Car. II., which invested the General Assembly with power to make laws "so as such laws, &c., be not contrary and repugnant unto, but as near as may be, agreeable to the laws of England, considering the nature and constitution of the place and people there," Mr. Justice Story, delivering the opinion of the Supreme Court, held this language: "In a government professing to regard the great rights of personal liberty and of property, and which is required to legislate in subordination to the general laws of England, it would not lightly be presumed that the great principles of Magna Charta were to be disregarded, or that the estates of its subjects were liable to be taken away without trial, without notice and without offence. Even if such authority could be deemed to have been confided by the charter to the General Assembly of Rhode Island, as an exercise of transcendental sovereignty before the Revolution, it can scarcely be imagined that that great event could have left the people of that state

[Palairet's Appeal.]

subjected to its uncontrolled and arbitrary exercise. That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and *private* property should be held sacred." He adds: "We know of no case in which a legislative act-to transfer the property of A. to B. without his consent has ever been held a constitutional exercise of legislative power in any state in the Union. On the contrary, it has been constantly resisted as inconsistent with just principles by every judicial tribunal in which it has been attempted to be enforced:" Wilkinson v. Leland, 2 Peters 657. In this assertion he is fully sustained. A few leading out of a much larger number of cases may be cited: Varick v. Smith, 5 Paige (N. Y.) 137; Hoke v. Henderson, 4 Devereaux 1; Norman v. Heist, 5 W. & S. 171; Pittsburg v. Scott, 1 Barr 314; Lambertson v. Hogan, 2 Id. 24; Brown v. Hummel, 6 Id. 86; Dale v. Medcalf, 9 Id. 108; Austin v. Trustees of University, 1 Yeates 260; Concord Railroad Co. v. Greeley, 17 N. H. 57; Gillan v. Hutchinson, 16 Cal. 163; Coffin v. Rich, 45 Maine 509; Southard v. Central Railroad Co., 2 Dutch. 13; Kelly v. McCarthy, 3 Bradf. 7; Powers v. Bergen, 2 Seld. 368. We need not stop to show that when such an effect is produced by the retrospective operation of a public and general statute, it is equally obnoxious to the objection as when directly attempted by a private special act. The precedents make no distinction between the cases: Greenough v. Greenough, 1 Jones 489; McCabe v. Emerson, 6 Harris 111; Bolton v. Johns, 5 Barr 149.

That this is the operation of the Act of April 15th 1869, entitled, "An Act to provide for the extinction of irredeemable rents," Pamph. L. p. 47, upon the constitutionality of which we are now to pass, is, we think, very manifest. There was undoubtedly vested in the appellants, before the proceedings under this act were instituted in the court below, by the law of the land, an estate in an irredeemable ground-rent issuing and payable out of the lot owned by the appellee—an estate in fee simple, descendable, devisable, alienable. That estate by the decree of the court appealed from, if valid, was extinguished; in substance, it was transferred and vested in the appellee and merged in the land. This was without the consent of the appellants. Why does it not fall within the well-settled principle before referred to?

It is contended that the property of the appellants has been taken in the exercise by the Commonwealth of her right of *eminent domain*, which she may exercise herself or confer upon corporations or individuals. If so, as it is conceded that full provision for compensation is made, it is within the saving of that other section of the Declaration of Rights—"nor shall any man's pro-

perty be taken .or applied to public use, without the consent of
his representatives and without just compensation being made :"
Const. Penna., Art. IX., § 10.  No doubt the right of *eminent
domain*, being for the safety and advantage of the public, over-
rides all rights of private property.  But for what public use has
this estate of the appellants been taken and applied ?  It has been
contended, as the preamble of the act declares, that "the policy
of this · Commonwealth has always been to encourage the free
transmission of real estate, and to remove restrictions on aliena-
tion, so that it is, and is hereby declared to be, necessary for the
public use to provide a method of extinguishing such irredeemable
rents, having a due regard for private rights."  But if this is the
kind of public use for which a man's property can be taken, there
is practically no limit whatever to the legislative power.  It would
result that whenever the legislature deem it expedient to transfer
one man's property to another upon a valuation, they can effect
their object.  What that department of the government considers
and pronounces to be the policy of the Commonwealth, the judi-
cial department must accept as such.  The members of the two
houses with the executive, are, upon all questions of policy, the
exclusive exponents of the will of the people.  Let us test the
principle now involved, by a case more extreme than that before
us, but which will be *experimentum crucis*.  If we can show that
a principle logically carried out leads to an absurdity, it is con-
clusive against it.  Suppose then the legislature should adopt what
has been a favorite theory with many political economists, that
small farms are injurious to the community, prevent the full
development of the agricultural resources of a country, and
ought therefore, as speedily as possible, to be united and formed
into large ones.  Then reciting this to be the true policy of the
state, let them provide that every farm of less than 100 acres
shall be attached to and become the property of the adjoining
owner of a larger farm at a valuation to be determined by a jury.
When the King of Samaria coveted the little vineyard of Naboth
hard by his palace, that he might have it for a garden of herbs,
and offered to give him a better vineyard than it, or if it seemed
·good to him the worth of it in money, he was met by the sturdy
answer,—"The Lord forbid it me that I should give the inherit-
ance of my fathers unto thee."  Would any one be hardy enough
to stand up in a republican country and claim for its government
a power which an eastern monarch dared not to assume ?  It was
well remarked by Mr. Justice Gilchrist in the Concord Railroad
Co. *v.* Greeley, 17 N. H. 57, that "even if the legislature should
declare that an act taking the property of A. and giving it to B.
as his private property, was an application of it to public uses, no
one would contend that such a declaration made that public which
in its nature and object was private."  It is not necessary to

define what is a public use,—it is quite sufficient to say that the object as set forth in the preamble of this act is not a public use within the right of *eminent domain* of the state. Other instances may be mentioned of the dangerous extent of this principle should it be judicially approved that the declaration of a general policy will constitute a valid public use. In the course of the development of the immense mineral resources of this state, it has become very common to separate the estate in the mines from the estate in the surface. This has been held to be lawful—as in entire conformity with the established principles of the common law of England, which is the substratum of our system of jurisprudence. It may be found, however, in course of time to be a very inconvenient and even perilous state of things—more so than an intangible, incorporeal hereditament, such as a ground-rent. The legislature may adopt the policy of preventing it, and may well, by laws acting prospectively, prohibit the creation of such separate estates in the same land. But how as to existing estates which have been lawfully created under the sanction of the law and the decisions of this court, are they to be subject to the legislative fiat? Can an Act of Assembly compel the owner of the minerals to surrender his property to the owner of the soil at the valuation of a jury? Can a law say that twelve men shall determine at what price I shall sell my property to another? In the consideration of the practical bearings of this question, we must strike out of the Act of 1869 the provision that the compensation to be awarded shall not be less than twenty years' purchase of the rent. If this is a legitimate taking for public use, that clause might well have been omitted. Whenever property is so taken, all that is necessary is, that some impartial tribunal shall estimate the damages sustained by the owner, and in the case of any corporate body or individual invested with such privilege, that such corporation or individual shall make compensation or give adequate security therefor before such property shall be taken: Const., Art. VII., § 4. What would be the value of coal-mines and mineral estates if the owners could be deprived of them at any time to be selected by the surface proprietor, by the valuation of a jury, upon the principle that private property may be taken from one man and transferred to another, on the ground that it is the policy of the Commonwealth to put an end to such estates separate from the surface of the soil? There are many rights of way resting on express grant—bought and paid for—but now very burdensome and annoying to the owners of the land over which they pass; can they be blown away by the legislature upon this same plea? I say nothing of private roads laid out by authority of law and paid for, nor of ways resting upon prescription and lapse of time, on account of the 1st section of the Act of April 21st 1846, Pamph. L. 416, which gives the Courts of Quarter

[Palairet's Appeal.]

Sessions power to vacate such roads and ways without compensation, and the decision in Stuber's Road, 4 Casey 199, which affirmed the constitutionality of that act, except individually to express my surprise that the same learned judge who wrote the opinion in that case, when he came to decide Baggs's Appeal, 7 Wright 512, did not advert to his first opinion. It is enough for the present purpose to say that the decision in Stuber's Road is not put on the ground of the exercise of the right of eminent domain. That act excepts private roads resting upon express grant, the evidence of which is still in existence; and apart from the fact that no compensation is provided, it is evident that private property, though derived from express grant or contract, is not therefore exempt from the right of eminent domain. I put aside the decision in Stuber's Road, as resting upon grounds peculiar to itself, not affecting this argument. One more illustration of the extent to which the principle may be carried will be sufficient. A man provides by his will an annuity for his widow for her life, and charges it on his lands, or if he dies intestate, the law does the same thing on partition among his heirs. Here is an encumbrance of the same character as a ground-rent, which though not perpetual, may still continue for an indefinite period—the life of the widow. It is within the policy recited in this preamble—it is an impediment to the free transmission of real estate, and a restriction on alienation which ought to be removed out of the way. If an act should be passed extinguishing this annuity of the widow on a valuation of her life interest—even though it were provided that it should not be less than the value fixed for such an annual sum by the annuity tables—would it not shock the moral sense and feeling of the entire community? Yet wherein does that case differ from the one before us except in immaterial circumstances?

It is said that the Act of November 27th 1779, 1 Sm. L. 479, commonly called the Divesting Act, by which the estates of the proprietaries were vested in the Commonwealth, is an instance in which private property was taken on reasons of policy. That act, like the revolution from which its necessity arose, can be a precedent for nothing in the ordinary course of legislation. It is well vindicated by its preamble, which claims that the rights of property and powers of government in William Penn and his heirs were stipulated to be used and enjoyed as well for the benefit of the settlers as for his own particular emolument, and that these rights and powers could no longer consist with the safety, liberty and happiness of the people. It is by no means clear that the Commonwealth, on the principles of public law, had not a strict legal right to all that was resumed, and that the compensation she made was not an act of liberality, as indeed it is declared in the act, to be in "remembrance of the enterprising spirit which distinguished the founder of Pennsylvania," as well as in con-

sideration " of the expectations and dependence of his descendants." It is true that William Penn, in virtue of his patent from Charles II., was the owner in fee simple of all the soil of Pennsylvania, but it is also true that with the soil there was granted to him and his heirs many royal franchises and prerogatives which belong to sovereignty. The province was a feudal seignory of which, while the crown remained paramount or liege lord, the Penns held the mesnality and were, as they were termed, the chief lords of the fee. The statute of *Quia emptores* was declared not in force. They stood then in many respects in the shoes of the crown. They accordingly maintained in a long series of contests with the provincial Assemblies that their private estates—the manors and other property reserved by them from sale and settlement—were not the subjects of taxation. In the " Historical Review of the Constitution and Government of Pennsylvania," published in London in 1759, which, though not written by Dr. Franklin, was composed under his direction (1 Sparks' Franklin 245, 3 Ibid. 105), the history of these contests is given, and it is shown how valuable the private estates were; the manors especially selected by their surveyors were the choicest lands to be found—the garden spots of the Province. These private estates were all exempted from the operation of the Divesting Act. The unappropriated lands the Assemblies never claimed to tax. These, with the purchase-money due in law or equity upon so much as had been appropriated by grant or supplement, and the quit-rents which formed a part of the purchase-money, were in all respects like the crown lands in the other colonies, which it was universally conceded, passed by the Revolution and treaty of peace acknowledging their independence and sovereignty, to the several states within whose charter limits they were situated. It was then a very grave question, and the tribunals before which only it could then be litigated would have been the courts of Pennsylvania, one of the parties to the suit, as the Articles of Confederation made no provision for such a case. It was wise, therefore, in the Penn family to accept the one hundred and thirty thousand pounds sterling granted to them, and that acceptance put an end to all question as to the constitutionality of the Divesting Act.

It has also been pressed upon us that private roads as well as lateral railroads are cases parallel with the act now before us, as in them, on mere grounds of policy, private property is taken for a private use on compensation made. As to private roads, they originated at a very early period by an Act of Assembly of February 20th 1735–6, Hall & Sellers 188, re-enacted in the 17th section of the Act of April 4th 1802, 3 Sm. L. 512, and incorporated by the revisers in the General Road Law of June 13th 1836, Pamph. L. 555; yet it was not until the year 1851 that the question of the constitutionality of these acts was raised before this

[Palairet's Appeal.]

court in Pocopson Road, 4 Harris 15, a case from Chester county. The point seems to have been elaborately argued by Mr. P. F. Smith, for the appellant, and many authorities cited; but Mr. Lewis, for appellee, contented himself with citing Harvey *v.* Thomas, 10 Watts 63. In the short opinion *per curiam*, affirming the proceedings, no notice whatever was taken of the point. In some of our sister states similar acts have been held to be unconstitutional: Taylor *v.* Porter, 1 Hill 140; Clack *v.* White, 2 Swan (Tenn.) 450; Dickey *v.* Tennison, 47 Mo. 373; but their constitutionality was well vindicated in Hickman's Case, 4 Harrington 580, in which it is said in the opinion of the Supreme Court of Delaware: "It is a part of the system of public roads, essential to the enjoyment of those which are strictly public; for many neighborhoods as well as individuals would be deprived of the benefit of the public highway, but for outlets laid out on private petition and at private cost, and which are private roads in that sense, but branches of the public roads and open to the public for the purposes for which they are laid out." As to lateral railroads, the constitutionality of the Act of May 5th 1832, Pamph. L. 501, was eventually sustained not upon the ground assumed in Harvey *v.* Thomas, 10 Watts 63, but upon the better reason, that the public had the use of them for the purpose for which they were used: Hays *v.* Risher, 8 Casey 169; Brown *v.* Corey, 7 Wright 495; Keeling *v.* Griffin, 6 P. F. Smith 307. It is not necessary to examine those cases in which, in some of our sister states, acts authorizing mill-owners to flood the lands of an upper riparian proprietor, on compensation, may have been held good. "They were designed," says Chief Justice Shaw, "to provide for the most useful and beneficial occupation and enjoyment of natural streams and water courses where the absolute right of each proprietor to use his own lands and water privileges at his own pleasure cannot be fully enjoyed, and one must of necessity in some degree yield to the other:" Fiske *v.* Framingham Man. Co., 13 Pick. 68; Hazen *v.* Essex Co., 12 Cushing 475.

I pass from the argument that this act is an exercise of the right of eminent domain. I have given more particular attention to it, because it is evidently the ground upon which the lawmakers themselves placed their right to pass the act in question. That respect which is due by this court to the co-ordinate branch of government, made it proper that this point should be fully examined and discussed.

If this act cannot be sustained on this ground, then it seems clear that it impairs a contract, and is therefore prohibited as well by the Constitution of the United States, Art. I. § 10, as by the Constitution of this Commonwealth, Art. IX. § 17. Here is a perpetual covenant,—personal, as to the original covenantor, but running with the land,—to pay an annual rent issuing out of it;

and the act by the proceeding under it, authorizes a decree which releases one of the parties from the performance of his contract upon the doing of a collateral act, not stipulated in the contract itself. No one has ever supposed that an Act of Assembly could authorize, in the case of a lawful existing contract, one of the parties to tender a collateral thing in satisfaction or extinguishment of it, whatever the value of that thing might be as compared with the damage sustained by the breach. Yet, in effect, that is just what is done by this act. The covenant is to pay an annual rent for ever; a jury are authorized to say what principal sum shall be a satisfaction and extinguishment of that covenant; a collateral thing not provided for in the contract, and which might as well be anything else than money.

Two other positions have been taken to sustain this act which it is proper to notice. It is urged that after all it is only the exercise by the legislature of the power to authorize the conversion of land into money; a power frequently exercised, and confirmed by this court in Norris v. Clymer, 2 Barr 285, and Sergeant v. Kuhn, Ibid. 393. But this power to authorize conversion has never been recognised as constitutional by this court, except in the case of the property of persons under disabilities, or where there were contingent interests, whose owners had not come into existence, and that, too, with the consent of those standing in the fiduciary relation of trustee, guardian or committee. The cases in which such conversion may be authorized seem well enumerated in Mr. Price's valuable Act of April 18th 1853, Pamph. L. 503. But it has been expressly repudiated and denied in the case of owners *sui juris*, not consenting nor presumed from acquiescence to have consented. "There is no adjudicated case," says Mr. Justice Coulter in Ervine's Appeal, 4 Harris 264, "where the legislature ordered the sale of one man's land when he was *sui juris*, under no legal disability to act, for the benefit of another person also *sui juris*, and where such legislative decree was sustained." In Fullerton v. McArthur, 1 Grant 232, the objection was made by a stranger; twenty years had elapsed without complaint by any one of the owners; and it was held that the presumption was conclusive that the act had been passed with their consent. In Kneass's Appeal, 7 Casey 87, it was expressly held that the legislature had no power to authorize the sale of the property of parties *sui juris*, and seised of a vested estate in the premises, against their consent. "Where it is judicially established," said Chief Justice Lewis, "that the estate of tenants in common cannot be divided without prejudice or spoiling the whole, and where no one of the parties will take the property at the valuation, the power to sell is exercised by the courts, and this power is derived from the legislature. But it is justified by the necessities of justice—the parties in interest cannot otherwise

enjoy their rights—and a sale in such a case is as valid as a judicial sale for payment of debts." See also Powers *v.* Bergen, 2 Selden (N. Y.) 368.

The remaining position to be considered is, that the constitutionality of this act can and ought to be sustained under the general power of the legislature to regulate property and to modify its incidents. But while it is true that this power is unlimited as to all future acquisitions by persons natural or artificial, the cases and precedents already referred to abundantly show that wherever the operation and effect of any general regulation is to extinguish or destroy that which by the law of the land is the property of any person, so far as it has that effect it is unconstitutional and void. Every power which the legislature possesses is subject to the prohibitions contained in the Declaration of Rights, and one of them, as we have seen, is, that they cannot take the property of a man, except for public use, without his consent. Perhaps no more apposite illustration of this is to be found than in the case of rights and titles acquired under Statutes of Limitations. " Suppose," said Mr. Justice Rogers, in McCabe *v.* Emerson, 6 Harris 112, " after title acquired to a tract of land by the Act of Limitations, the legislature should extend the time; or suppose a writ of error barred by a lapse of time, would any person contend that the legislature would have a constitutional authority to interfere so as to affect rights thus acquired? This will scarcely be pretended:" Ervine's Appeal, 4 Harris 256; Baggs's Appeal, 7 Wright 512; Billings *v.* Hall, 7 Cal. 1; Knox *v.* Cleveland, 13 Wis. 245.

The Act of March 31st 1812, 5 Sm. L. 395, concerning joint-tenancy, has been referred to as abolishing the incident of survivorship in existing estates, and held by this court, in that respect, to be constitutional in Bambaugh *v.* Bambaugh, 11 S. & R. 191. But in that case Chief Justice Tilghman said : " There is no force in the argument that the operation of the act on existing estates was an invasion of vested rights. Who should be the survivor was in contingency, and in the mean time, either joint tenant might have severed the estate by legal means without the consent of his companion. * * * The act deprived no man of his property. When a title had already accrued by survivorship it remained untouched." The Act of April 27th 1855, Pamph. L. 358, converting estates tail into estates in fee, has been referred to, but that act is prospective and applies only to all estates thereafter created. But even if it had applied to all existing estates tail, which perhaps it might (De Mill *v.* Lockwood, 3 Blatchford C. C. Rep. 56), of what value is the property of issue in tail or remaindermen which can be barred without their consent by the deed of the tenant in tail? It would be very different with a remainder after a life estate. In Bumberger *v.* Clippinger, 5 W. & S. 311, this

court refused to compel a purchaser to take a title depending upon an Act of Assembly authorizing a tenant for life to sell in fee and invest the proceeds. To the same effect is Rogers *v.* Smith, 4 Barr 101. And in Ervine's Appeal, 4 Harris 256, such an act was directly held to be unconstitutional and to give no title. In Schafer *v.* Eneu, 4 P. F. Smith 304, an estate was devised in 1851 to a woman for life, remainder to her children. She left no children issue of her body, but children adopted in conformity with the Act of Assembly of May 4th 1855, § 7, Pamph L. 431. ".If the act were construed," said Mr. Justice Strong, "as it is claimed by the plaintiff in error, as applied to the present case, it would work a result which it is not in the power of the legislature to effect. The will of James Eneu took effect in 1851. It gave a life estate in the rent to Mrs. Clark, with a contingent remainder to her children, and the residue of his estate to his children, naming them, in fee. The children thus named (and the children of such as are deceased) are the defendants in error. They had a vested interest in the rent when the Act of 1855 was passed. It was not in the power of the legislature to take away that vested interest and give it to such persons as Mrs. Clark might adopt." No case could well be framed more directly in point to show that when the effect of any change or modification of the rules or incidents of property is to transfer a vested estate from one person to another, it is so far ineffectual and invalid.

Upon the whole, then, we have come to the conclusion that the Act of April 15th 1869 is unconstitutional and void. The particular provisions of this act seem just and reasonable; but they are not features which affect the character of the act as contrary to the fundamental law—the *lex legum.* We are bound to look at the principle upon which it is based, and its logical and necessary consequences. As it appears to us, it would overthrow the most valuable barriers which are reared against legislative tyranny, and make all property to be held by a most insecure and uncertain tenure. This act may be but an entering wedge. Its salutary and conservative restrictions may be repealed hereafter without touching its principle, upon which rests the question of its constitutionality, and every man will then hold his ground-rents,—and the same provision may be extended to other kinds of property,—upon the will of a jury in determining for what price he shall be compelled to sell them.

Judgment reversed.

Agnew, J.—This case has been argued as if the ground-rent owner had been *deprived* of his property by a *taking* for private use, contrary to the Constitution of the state. In my judgment this is not the character of the law—it is *remedial* rather than

aggressive.   The act is entitled an act for the extinction of irre-
deemable rents, and recites the irredeemable charge upon the land
as an obstruction to the exercise of the rights of ownership over
the property, and as contrary to the policy of the Commonwealth,
which has been to remove restrictions upon alienation, and to en-
courage the free transmission of estates.   It then provides a rem-
edy, if the parties cannot agree, whereby the ground-rent may be
valued and appraised, the price paid to the ground-rent owner,
and the rent thus extinguished.   It is evident that the ground-
rent is not taken, but is only converted, by act and operation of
law, to free the land from the burden imposed upon it.   The owner
of the ground-rent is not deprived of his property, but for a proper
purpose is compelled to take it in another form.   The argument
against the law, proceeds on the ground that the rent is a *separate*
estate issuing out of the land, and affirms that because it is sepa-
rate, it cannot be changed or converted.   But separateness of in-
terest is no bar to a remedy.   The estates or interests of joint
tenants, tenants in common, tenants for life, and in remainder,
and trustees and *cestui que trusts*, are equally separate, each hold-
ing his particular interest to and for himself.   It is the fact that
both interests belong to a single subject of property, and are so
intertwined together that they operate as a hindrance to the seve-
ral owners to exercise their rights freely for their own interests,
which makes them the subject of remedy.   In the present case
the estates are separate, one is corporeal and the other incorpo-
real it is true, but both inhere in a single subject, and grow from
the same stem.   The incorporeal follows the corporeal into every
inch of soil, and its existence is so incorporated with the land, and
so permeates and surrounds it, that the owner and occupier of the
ground is for ever subject to its domination, no matter what use
or purpose he may desire to make of his land.   It is not like a
division of ownership by lines on the ground, or by horizontal
lines, as coal and minerals held separately, where each owner holds
independently, and no further partition is needed, but the ground-
rent is a charge on every part and parcel, and the owner of the
land for ever stands beneath the encumbrance.   In its own essence
what is the ground-rent but a sum of money, annual in the form
of a rent, single when capitalized by appraisement ?   To the
owner it is only money, whether in the form of capital or the in-
terest upon that capital.   In what does a ground-rent differ from
an interest-mortgage, which if irredeemable must for ever consume
the profits of the land ?   Is no time a bar, and can it never be
satisfied ?   But as to the land owner the case is essentially differ-
ent—the rent is a burden bound upon the back of the land, a load
under which it must stagger for centuries, until willing parties can
be found to unstrap the burden.   This the law says is contrary to

the policy of the state. Is there no remedy for it? Is it in the power of two men by the exercise of their joint wills, in the form of a deed, so to bind up the lands of the state, in perpetual chains, that even future generations cannot unwind their links? Must the burthen continue for a thousand years, and if then no one be found willing to unbind it, shall it continue a thousand more? The law is that no one can by will, or deed, or trust, create a perpetuity in lands longer than a life or lives in being and twenty-one years and nine months thereafter. Dead generations are not the lords of the soil, nor can they impose their shackles upon the men or property of future generations. When, therefore, a burden such as this clings to the land, like the Old Man of the Mountain upon the back of Sinbad, there must be a power in government to shake it off, and let the land go free. It cannot be that all the lots and lands of a great city shall be bound up for ever in irredeemable rents to the injury of owners, and of commerce, without a remedy.

What, then, is the purpose of this act? It does not seek to take the ground-rent from its owner for public or for private use, but simply to transmute an annual sum of money into its equivalent sum of capital, in order that the impolitic, perpetual union of two estates, growing from a single stalk, may be separated for the welfare of the state. Are not the powers of government adequate for this? In thinking and speaking of the power of eminent domain, we are very apt to be controlled in our thoughts by the commonest mode of its exercise, to wit, the taking of land for public use. But this is not its only form. Domain here means dominion, and it is eminent because of its high control. This high power or dominion of the state is not confined to a single mode of exercise, though seldom seen or thought of in others, but is to be found in all those forms grouped under the name of the police power of the state—a power exercised for the welfare of the people, and rendered necessary by the circumstances which affect the common good. Hence laws for the preservation and promotion of peace, good order, health, wealth, education, and even general convenience, are supported under the police power of the state. Under these laws personal rights, rights of property, and freedom of action may be directly affected, and men may be fined, imprisoned and restrained, and property taken, converted and sold away from its owner. The principle of such laws is most easily perceived and recognised when men are held liable for nuisances acts, and negligences affecting the health and safety of society, when the marriage contract is dissolved, and when property is subjected to charges and sales for matters affecting the public interest and welfare. Beyond this is a wide domain of general convenience where the power is also exercised. Thus estates held in joint tenancy and common may be divided among the tenants

17 P. F. SMITH—32

even by conversion and sale, life estates and remainders may be separated from each other, qualified inheritances expanded into absolute fees, and contingent and executory interests extinguished.   What greater reason has the owner of an irredeemable ground-rent, coming down from a former generation, to complain that his estate is appraised, converted into capital, and paid over to him in order. to unfetter the land, than the owner of a life estate in the land itself, or the owner of a remainder or reversion, or. of some contingent or executory interest?  All alike bow before the power of the *parens patriæ*, exercised for the good of all the children of the state.

The reply that is made that the purpose is to make partition in some of those cases, and to unfetter the estate in others, states no real difference and makes no just distinction.   In this case it is no more than a mere partition between the owner of the land and the owner of the rent.   The union here is really more intimate, and the shackle upon the land more tight, than in the case of a widow's third, a life estate, an estate in common or joint tenancy, or a charge in the title.   Yet these interests may be reached by judicial proceedings, and even a sale, conversion and extinguishment to effect a separation among the owners.   The right of survivorship in joint tenancy existing before the Act of 1812 was held to be liable to a legal extinguishment: Bombaugh *v.* Bombaugh, 11 S. & R. 191.   Even special acts for the conversion of estates have been held to be valid: Norris *v.* Clymer, 2 Barr 277. In that case Chief Justice Gibson said: "But the constitutionality of the act stands on much safer ground than a chancery power unseparated from the other powers of the government, and reserved to the legislature.   It stands on the notions of parliamentary power brought by our forefathers from the land of their birth, and handed down to their descendants unimpaired, in the apprehension of any one, by constitutional restriction of ordinary legislation.   A list of nine hundred statutes in principle like the present has been laid before us ; some of them enacted at the instance of judges of this court, some at the instance of law judges of the Common Pleas, and some at the instance of learned and eminent lawyers, most of whom executed trusts under them without suspecting that their authority was prohibited by the Constitution.   It is not above the mark to say that ten thousand titles depend on legislation of this stamp."

This remedial legislation, as he calls it, he further remarks, has prevailed from the foundation of the province to this day. After reciting the only provisions in the Bill of Rights against the privation of property, and taking it for public use without just compensation, he adds, "Now it cannot be said that this statute has deprived any man of his property, or applied it to any use but his own."   This case was reaffirmed in Sergeant *v.*

Kuhn, 2 Barr 393 ;. Kerr v. Kitchen, 5 Harris 434 ; Morris v. City of Reading, 9 Id. 201–2.   It is true that Norris v. Clymer was slightly impugned by a divided court in Ervine's Appeal, 4 Harris 256, Bell and Gibson, C. J., dissenting.   There it was held that a special act for a sale and conversion was invalid because the devisees interested in the estate were all *sui juris*, and able to convey themselves.   The same distinction as to persons *sui juris* was afterwards taken in Kneass's Appeal, 7 Casey 87.   But it may well be that in ordinary cases, where owners are *sui juris*, the law will not compel conversion, for in such cases there is no necessity, or great purpose of public policy, to invoke the high power of dominion or police of the state.   But the fact that owners are *sui juris* does not in itself prevent partition or severance of interests in a single thing.   Hence we have laws for partition, valuation and sale in the Orphans' Court and Common Pleas, and proceedings to effectuate the same thing in equity, whether parties be of age or minors, the purpose being not privation of right but a separation of interests.   Then what clause of the constitution does the act for the extinguishment of ground-rents violate ?   It does not deprive the ground-rent owner of his property, or take it for any public or private use.   It merely dissolves the relation between him and the owner of the land out of which the rent issues, and gives him a capital sum of money in lieu of an annual sum.   Nor do I hold this can be done in an ordinary case between the parties to the deed, or the survivor and others, or alienees of both in their lifetime or for twenty-one years afterward ; but only when by lapse of time the contract relation between parties long in their graves, becomes a subject of regulation, for the good of a subsequent generation of men.   I know it may be said that the act itself makes no distinction.   This is true, but it does not follow that the act is therefore void.   A law like a writing between private parties, must have effect where it can operate.   This is a question of power, and to the extent of the power its exercise must be held to be valid.   Though a deed fail to express the grantor's power, and on its face may seem to transgress it, yet if he have a power to convey, it will operate to that extent.   So, though this act may not operate on existing parties to a deed or their survivors, or for twenty-one years afterward, if it can then operate we must recognise its validity to the extent of lawful legislative power.   All men are supposed to know the law, and that its policy forbids perpetuities, and therefore though their deeds may bind themselves and their immediate successors, they cannot bind posterity for all time to come.

I think the law can be impugned only on the ground that it impairs the validity of a contract ; and to this extent I agree that it is not competent for the legislature to sever the ground-rent from the land to which it is attached by its contract relation as

between the parties to the contract and their immediate privies, to the extent that it is in the power of men to create a perpetuity, but no farther. Beyond. this, to carry the sanctity of a contract is to make the act of two individuals rise higher than the powers of government and the interests of the state, and to dominate both the power of the legislature and the rights of the people. It cannot be that the contracts of a past generation are beyond the reach of law for a proper purpose, a purpose not to destroy, but to change, to suit the interests of the state. Otherwise a contract would stand on a higher platform than that of the people to change their form of government. A change of the state constitution would effect nothing, for the contract standing on the higher ground of the Federal constitution would still claim its protection, and thus descending on unborn generations, would cling like the fatal shirt of Nessus, until escheat or an earthquake should end it. I think, therefore, that the legislature can sever the rent from the land by a fair valuation and payment in money in the case of a ground-rent deed all of whose parties are dead and more than twenty-one years have elapsed since the death of the last survivor. But as these facts do not appear in this bill and answer the judgment should be reversed.