## Augustus H. Hill v. Theodore W. Chambers.

*Trover: Estates of deceased persons: Administrators: Evidence.* In an action of trover by an administrator against a son of the deceased who had carried on the latter's farm, for certain grain, stock and farming implements on the farm and claimed to belong to the estate, and to have been converted by the defendant, it is incumbent on the plaintiff to show definitely that the specific property belonged to the estate; and evidence that the intestate years before owned a horse and wagon which he sold, and with the proceeds bought a farm and afterwards (nearly twenty years ago) sold that farm and purchased the farm on which this personalty belonged, in his wife's name, and to avoid the payment of his debts, is neither pertinent nor material, at least in the absence of any showing that the prosecution was in the interest of creditors who were in a position to attack the conveyance, or that there were any creditors.

*Husband and wife: Tenancy by the curtesy: Vested rights.* Under our laws as they stood in 1854, the husband did not, even though there were children, become tenant by the curtesy initiate, in lands acquired by the wife from some one other than the husband; but he obtained only the chance to hold for his own life from her death, and the vesting of any right and interest in him was postponed to, and made contingent upon, her death in advance of his.

*Vested rights: Legislative authority: Married woman's act.* And the mere expectancy of the husband, based on conveyance to the wife in 1854, and which in consequence of her continuance in life never ripened into a vested right or interest, is not such a right as is protected against legislative abrogation; and the married woman's act of 1855 completely effaced it.

*Farming products, etc.: Ownership: Husband and wife: Evidence: Presumptions: Inferences.* The question of the ownership of farming products, stock and tools on a farm owned by the wife and occupied by the family as a homestead and carried on by the husband, is not to be determined by presumptions or inferences as to whether the husband occupied as tenant, and hence as principal, or as servant of his wife, but upon the facts; and evidence of how the matter was understood and treated between the husband and wife would be relevant.

*Evidence: Statute of frauds.* In such an action evidence of a parol agreement between the defendant and the deceased and wife (his father and mother), that he was to remain on the farm and manage affairs and to support the parents during their lives, in consideration that what there was of the property should belong to him, and that in pursuance of this agreement he did remain and receive possession of the whole property, and did manage and furnish the support as agreed, and in all respects carry out his part of the agreement up to the death of his father, is held admissible and not open to the objection that it went to show a verbal arrangement required by the statute of frauds to be in writing.

*Heard October 15. Decided October 27.*

Error to Kalamazoo Circuit.

*May, Buck & Powers,* for plaintiff in error.

*Severens, Boudeman & Turner,* for defendant in error.

GRAVES, CH. J.

The plaintiff brought trover to recover for certain grain and other personal property which he claimed to belong to the estate of his intestate, and alleged to have been converted by the defendant, who was a son of the intestate.

Verdict and judgment having passed for the defendant, the plaintiff removed the cause to this court on writ of error and bill of exceptions. The objections stated in the bill of exceptions are numerous, and all are said to be insisted on. But we are satisfied that several of them are wholly unimportant, and require no comment. In considering the others it will not be necessary to advert specifically to each. To do so would extend our opinion ureasonably, and the material points may be disposed of without attempting it.

The nature of the action required the plaintiff to show that the identical property alleged to have been converted belonged to the estate of John A. Chambers, the plaintiff's intestate; because if it belonged to anybody else, he had no concern with it. He therefore endeavored to maintain that proposition by evidence, and the contest at the trial seems to have been chiefly, if not wholly, confined to that phase of the case.

The investigation on that subject seems to have been mainly indebted for whatever of difficulties or perplexities attended it, to certain family arrangements and dealings which had taken place. Still the question was at last substantially one of fact, to be settled by the jury upon their opinion of the evidence.

A brief reference to some of the leading circumstances will help to explain the shape and character of the controversy, and lead to a clearer understanding of the points. In the spring of 1854 the intestate removed with his wife and children from Gun Plains to Alamo. There a farm was purchased and the conveyance was made directly to the wife. The intestate and his wife immediately settled on

the farm, and they continued to reside there until his death, which occurred in March, 1869. From about the time of the purchase, in the spring of 1854, it was the home of the intestate and his wife, and of such of their children as chose to make it so. When the old people went on to this farm they had two sons, who went with them: the defendant and Andrew J. Chambers, who was older than defendant. The defendant was then about fourteen, and Andrew somewhere from fifteen to eighteen.

Up to about 1861 or 1862 the intestate managed the farm and carried it on with the help of these sons. He seems to have proceeded according to his own judgment and discretion in managing and stocking it, and in handling the stock and tools.

About the time last mentioned an arrangement was made with the sons by which they were to take the farm, stock and tools, for a term of three or five years, the evidence not being distinct and clear as to the duration of the term, and at the end surrender the place and leave upon it a certain amount of stock. The terms of this arrangement are not fully and plainly shown. But it appears to have been satisfactorily carried out. During the term, and in March, 1862, Andrew married and took his wife there. Up to this time the parents and their sons appear to have lived on the place together; and, subsequently, and until 1867, they, together with Andrew's wife, resided there as a family.

The term having then expired, the sons left the farm, and the intestate proceeded to carry it on as formerly.

In 1868 Andrew died, and the old gentleman, finding his health failing, desired the defendant to return and stay with him and take charge. He also invited Andrew's widow to make her home there. The defendant at once returned, as requested, and immediately took control of the farm and stuff on it. Andrew's widow also went there to live about the same time.

The health of the old gentleman continued to fail; and in about a year, that is in March, 1869, he died.

This summary will serve to show that there was some room for raising a controversy about the right to the personalty on the farm, and will indicate that whatever uncertainty should be thought to exist on the subject, could only be cleared up by such explanations as the surviving members of the family would be able to give.

As before stated, it was incumbent on the plaintiff to show that his intestate owned the specific property claimed to have been converted by the son. In seeking to do this, he first called Mr. Ives as a witness, and proved by him that he knew the intestate at Gun Plains, in 1848 or 1849, and that he then had a span of horses together with a wagon and harness. He then inquired of the witness what that property altogether was worth, and the defendant's counsel objected that it was irrelevant and immaterial. The counsel for the plaintiff then explained and stated that he proposed to show that the property mentioned was used by the intestate to buy a farm in his own name; that afterwards he sold that farm, and with the proceeds purchased the farm in Alamo, and caused the deed to be taken in his wife's name; and did so, with her knowledge and assent, to avoid the payment of his debts; and the proposed proof was claimed to be admissible as going to show that the title to the personal property in suit was in John A. Chambers, the intestate, at the time of his death, and not in the wife. The court sustained the objection.

It does not appear by the record that the matter offered was pertinent or material. Nearly twenty years had run after the conveyance to the wife, and there was no pretense that anybody had ever complained or raised any question about it. Moreover, it does not appear at all that the plaintiff was prosecuting in the interest of creditors, or that there were any at the time of the death of the intestate, or had been for years preceding his death; and, further still, it will be noticed that none of the facts embraced in the offer, or any that had in any wise appeared, in any manner connected the specific chattels sued for with the ownership of

30 MICH.—54.

the farm.    In no view which occurs to the court could
the facts, as and when proposed, have warranted any infer-
ence that the identical chattels sued for belonged to John
A. Chambers at his death.

Passing this question, we come to another, relating to
the ownership of the farm.    The plaintiff claims that
although the land was deeded to the wife in 1854, her hus-
band, the intestate, as the law was then, acquired certain
interests or rights in it in his character of husband, which
were not subject to legislative invasion, and could not be
taken away by statute; and that these rights or interests
having vested in him in 1854, and he not having done any
thing to divest them, they continued after the legislation
of 1855, and until his death.    That these rights or inter-
ests were such as to give him, as against his wife, the power
to manage the land and the unqualified beneficial use of it.
And on the strength of this position, the plaintiff contends
that the legal ownership of the stock and products of the
farm accrued to his intestate.

Without stopping to examine the justness of the infer-
ence suggested, or the pertinency of the conclusion sought
to be inferred to the proposition required to be maintained;
without pausing to inquire whether if it were admitted that
the plaintiff's intestate held the supposed right or interest
in the farm, it would in any way breed an inference that
the identical chattels in controversy belonged to the intes-
tate at his death, and especially in a case where the proof
is not clear to show that the very things themselves were
produced from it or connected with it, we may pass to the
main question : Did the plaintiff's intestate, in virtue of
the grant to his wife in 1854, become vested with the right
or interest claimed?    At that time the law regulating the
subject was the act of 1844 (*L. 1844, p. 77*) as modified by
the revision of 1846 (*R. S. 1846, p. 340*) and section five
of article sixteen of the constitution of 1851.    The effect
of these provisions, whatever it may have been otherwise,
in regard to land acquired by the wife in 1854, from some

one other than her husband, was to change the common-law rule in regard to the right enuring to the husband.    As a result of these regulations, he did not, as to such land, even though there were children, become tenant by the curtesy initiate.    He obtained the chance, and that only, to hold for his own life from her death, and the vesting of any right and interest in him was postponed to, and made contingent upon, her death in advance of his.    The birth of issue was deprived of all influence upon the quality of his right, or on the time of its vesting.—*Hathon v. Lyon, 2 Mich., 93.*  This state of things continued until the act of 1855.—*L. 1855, p. 420.*  By force of that statute the wife's realty was freed from all right growing out of marital relation, except in cases where it had vested, and except also in cases, if any, protected by the constitution.—*Tong v. Marvin, 15 Mich., 60.*  And we think the mere expectancy of the husband, based on conveyance to the wife in 1854, and which, in consequence of her continuance in life, never ripened into a vested right or interest, was not protected against legislative abrogation.—*Cooley C. L., 361, 285, and cases; Schouler Dom. Rel., 216, 217 and cases; Sleight v. Read, 18 Barb., 159; Lucas v. Sawyer, 17 Iowa, 517.*

As we have seen, the wife not only continued in life from the time she received the conveyance in 1854 until after the act of 1855, but has actually survived her husband, and is still living.  Under these circumstances, whatever chance or contingent right enured to the intestate in his character of husband in 1854, in virtue of the grant then made to his wife, it never ripened into a vested right or interest, or into any thing not subject to be swept away by legislation; and the statute of 1855 completely effaced it.

The next question relates to the conclusion to be drawn from the fact that the wife held the legal title to the farm, that this farm was the home where she and her husband lived together with their children, and that the husband managed and conducted it.  In regard to this, the parties took conflicting positions.  The plaintiff's counsel

urged that it was matter of presumption that the husband occupied as tenant, and hence as principal; whereas, the defendant's counsel maintained that it was necessary to presume that the intestate acted as the servant of his wife, and not as principal at all.   And these opposing views were supposed to be important on account of their possible bearing upon the title to the personalty.   If the intestate managed the farm in his own behalf, it would be evidence, it is said, that he owned the personal property on it; and, on the other hand, if he acted as his wife's servant, it would be evidence that she owned it, and he did not.   I do not perceive any reason for resorting, or seeking to resort, to presumption on this subject.

It is well settled that these presumptions of fact never obtain against positive proof, and are only introduced to supply the want of real facts.

The farm in question was occupied by the intestate and his wife as their home and the home of the family, and, in the usual way of farmers, he managed outside matters, and she those which were indoors.   Neither seems to have treated or regarded the other as master or servant, or as tenant or landlord, and indeed there is nothing to create any impression that they imagined that such relation existed.   There is consequently no ground for supposing that they regulated their conduct in any degree in view of the existence of such a relation, and it would be unreasonable and misleading to interpret their acts by intending motives they never felt, or by a state of things which they never thought of.   If any presumption intervenes to influence the question of title to the products of the farm in this case as presented, the implication, *prima facie*, on the circumstance of the wife's ownership of the land and the management of it by the husband, is rather that ownership of products followed the farm title.

There was certainly no necessary connection between the legal ownership of the place, and the legal title to the stock and tools, or the immediate products.   And the parties rightly went into evidence of facts and circumstances

to ascertain how this was, and to enable the jury to find where the truth lay. And the result was to be reached upon the facts, and not upon fictions or forced inferences. Keeping in mind that the specific issue was upon the property of the intestate in the personalty in suit, and observing also the way of holding on the farm, and the relations of the occupants, and observing further that it was material to find out, in the somewhat ambiguous state of things which prevailed, whether the intestate or his wife was owner of the personalty, we cannot help thinking that it was pertinent and proper to ascertain how it was understood between the husband and wife, and what was the general sense and expression on the subject in the family. And, in our judgment, it was entirely competent to bring before the jury the views in regard to that matter which may have been uttered in the family by or in the presence of the intestate or his wife, and also to give evidence whether the wife interfered, or offered to interfere, and if so, when and under what circumstances, with her husband's management. Evidence of this kind, it appears to us, was strictly relevant to the issue, and unobjectionable. The court below, however, thought differently, and, as will appear by the record, excluded such proof. In this there was error.

The defendant was allowed to give evidence of a parol agreement with his father and mother on his return, about a year before his father's death, by which he was to remain and manage affairs, and support the old people during their lives, in consideration that what there was of the property should belong to him. He was also allowed to give evidence tending to prove that in pursuance of this agreement he did remain and receive possession of the whole property, and did manage and furnish the support as agreed, and in all respects carry out his part of the agreement up to the death of his father.

This proof was objected to by the plaintiff, and the substantial ground of the objection was that it went to show a verbal arrangement required by the statute of frauds to be in writing.

In the first place we think the evidence was admissible in any view of this objection, on the ground that it had some bearing on the right. to the personalty, as between the intestate and his wife. It bore somewhat on the views that they held in regard to the ownership and management of that property. But we are further of opinion that in this suit, by the administrator of the father's estate against the son, for the alleged conversion of the personalty, the evidence was lawful. It tended to show, in one view of it, that the parents transferred the personalty to the defendant, upon his undertaking to manage affairs and support them, that they gave him immediate possession and exclusive control, and that during the remainder of his father's life he continued in full possession and authority, and in all respects performed on his part, and there does not appear to have been any evidence of his having deviated from the engagement at any time. This evidence was proper to be interpreted by the jury, and if they were satisfied from it that, as claimed by defendant, it was understood when the arrangement was made that the defendant should then be vested with the personalty, in consideration of his undertaking to manage there, and support the old people during their lives; that in pursuance thereof he was allowed to take, and did take immediate possession, and thereafter retained it and continued in control, and at once proceeded to perform, and henceforth continued to perform, all that was required of him by the arrangement, it was competent to consider the transaction in regard to the personalty as not invalid for want of writing. Considering the transaction in that light, it imported delivery and something in the way of payment, and writing was not required.

This disposes of the case, and of all questions of importance likely to arise on another trial.

For the errors suggested, the judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.