## JAMES CARR v. JAMES McCARTHY.

*Trover and conversion—Evidence—Hearsay—Declarations of person in possession of property—Statute of frauds—Contract not to be performed within one year.*

1. The declarations of a party in possession of personal property, which the defendant claims to have purchased from him, as to his ownership, not made in the presence of the plaintiff, who claims to be such owner, are incompetent evidence to establish the ownership of the alleged vendor.

2. A *verbal* agreement of a son with his father to support his parents during their natural lives, under which he entered into possession of land in which they had a life-estate, being capable of execution within one year, is not void under the statute of frauds; and if the son was put into possession of the land under said contract for the purposes of cultivation, and controlled and cultivated the same, in the absence of any agreement for the payment of rent other than by such support of his parents, he is the *absolute* owner of the crops raised on the farm.

3. The law is held to have been correctly laid down in the charge (see opinion) under the circumstances of this case.

Error to Livingston. (Newton, J.) Argued April 27, 1888. Decided May 11, 1888.

Trover. Defendant brings error. Affirmed. The facts are stated in the opinion.

*D. Shields* and *H. C. Van Atta,* for appellant, contended:

Bryan Carr, being in possession of the property when he transferred it to defendant, is presumed to have owned it: 1 Greenlf. Ev. (12th ed.) § 34; *Cullen v. O'Hara,* 4 Mich. 137.

*J. L. Topping* and *A. U. Wood,* for plaintiff, contended as stated in the opinion.

MORSE, J.· The plaintiff sued defendant in trover for the value of certain personal property. The parties are brothers-in-law.

The plaintiff recovered judgment in the circuit court for Livingston county in the sum of $512.55.

Bryan Carr and Catherine, his wife, the father and mother of plaintiff, had for many years owned and occupied a farm in the township of Deerfield, Livingston county. In 1879, both being then upwards of 70 years of age, the old people concluded to, and did, make a division of their property. They had four children, all adults,—two sons and two daughters. The daughters were married. They owned 160 acres of land and some personal property. They gave a mortgage of $1,000 to the two daughters upon this land, $500 to each, and then divided it into halves, and deeded one-half to the plaintiff, and the other to Patrick Carr, his brother. The sons each gave back a life-lease to their parents.

The claim of the plaintiff is that, at the time this division of property was made, he and his father entered into a verbal agreement that the plaintiff should work the whole farm, live in the house with his father and mother, have as his own absolutely what personal property there was then on the farm, take care of and support them and each of them, and furnish them with what spending money they might need, during their lives, for which he should receive, besides the personal property then on hand, all he could produce and raise upon the farm.

Under this arrangement, or some other, the proofs show plaintiff took possession of the farm in the fall of 1879, and worked and operated it as his own, and supported his father and mother, until sometime in 1886, when his troubles began.

The theory of the defendant is that the personal property upon the farm, at the time the plaintiff went there, was not to be his absolutely, but, by the arrangement between him and his father, was to be and remain in the possession and

ownership of the old people while they lived, and that plaintiff was to have what might be left at the time of the death of the one last surviving, and that he had no right during their lives to sell any property off from the place, and appropriate it to his own use and benefit.

This controversy arises as follows: In May or June, 1886, the plaintiff had an altercation or trouble of some kind with a woman in the neighborhood by the name of O'Connell. She procured his arrest for alleged assault and battery upon her. His father went his bail. The plaintiff left the country before the trial, under fear of the result of the same. He went away in June, leaving wheat and oats upon the place, without making any provision for harvesting them. He was gone about six weeks. When he returned, he found most of the personal property upon the farm had been taken possession of by the defendant. The grain had been harvested and taken care of by McCarthy. He demanded all the property of the defendant, which demand was refused. He was again arrested, tried, and convicted of assault and battery, and sent to the Ionia House of Correction for 90 days. He served out his term.

The plaintiff claimed that he went away with the consent of his father, and that he was induced to do so by his brother and the defendant, who represented that, if he stayed and stood trial, he would probably be sent to State prison, as the woman was going to claim that he made a felonious assault upon her; that he did not intend to abandon the farm, or the support of his father and mother, but only to remain away for a short period, which his father thought was best, until the assault and battery matter was settled or quieted in some way. As soon as he left, the defendant stepped in and took everything.

The defendant's claim was that the father, Bryan Carr, had a right to dispose of all this property, and that he received it under an arrangement with said Bryan Carr.

Some of the property sued for had been purchased by the plaintiff, but the defendant claims that such property was purchased by plaintiff with the proceeds of the produce of the farm, and that, having abandoned the support of his father and mother, the plaintiff had no interest in it, and it belonged to his father.

The defendant complains that he was not permitted to show this arrangement that he made with Bryan Carr, the father. When he received the property, he claims that the old gentleman was in possession of it, and that he had a right to show that he bought it of him, and the whole arrangement he made with him, to show his title. There is no doubt of this proposition. He had a right to show the source of his title, and what and how he paid for the property. But was he entitled to prove what Bryan Carr said to him about his ownership of the property when the plaintiff was not present? We think not. If the old gentleman had been living, his declarations could not have been admitted in his own favor, or in favor of any one claiming title under him; and his death did not make the testimony any less objectionable. That Bryan Carr told defendant that he was the owner of the property when he delivered it to him was not competent evidence to establish such ownership, and could have no possible bearing upon the question at issue in any other respect.

He also undertook to show what Bryan Carr said to others about the ownership of the property, and also general repute in the neighborhood that the old gentlemen owned it. This was hearsay, and properly ruled out. The fact that Bryan Carr was dead at the time of the trial could not change the rule.

But the questions looking towards the proof of the purchase of this property by the defendant, ruled out by the court, were most of them leading; and, as it appears by the record, he was afterwards permitted to show that he purchased many of the items of Bryan Carr, and allowed substantially to show

his whole arrangement with the old gentleman. We think the jury were fully informed that defendant claimed under a purchase from the old gentleman, and that he based his title upon the theory that none of the property belonged to plaintiff absolutely, and that, by his abandonment of the premises, he had lost any right to any of it. And we are also unable to ascertain from the record the full extent of the testimony received under this branch of the case. The bill of exceptions states:

"The foregoing [speaking of the whole of the testimony returned] is not the substance of all the testimony given on the trial, but the substance of a part of it."

Without all the testimony before us, we cannot presume error. But there is enough in the record to show that defendant was permitted to state that he purchased or received all the property from Bryan Carr. He testified, without objection:

"I cut the wheat and oats that have been mentioned, in pursuance of an agreement made between myself and Bryan Carr. I was to pay him $100 for the horse. I was to harvest and take care of the crops, and was to give him whatever he wanted occasionally out of the crops, and take him to Fenton, and take him to church, and buy him whatever little things he wanted out of the crops, and the remainder was to go to myself," etc.

The circuit judge, in substance, charged the jury as follows: That if the plaintiff made a verbal agreement with his father, founded upon a valuable consideration, to support his father and mother during their natural lives, and that he entered, under such arrangement, upon the lands of which the father and mother had a qualified title,—a title for life,—such contract would be valid, and not void under the statute of frauds; and if the plaintiff, under such contract, was put in possession and control of the farm for purposes of cultivation, and controlled and cultivated the same, and there was no agreement that plaintiff should pay the rent in crops

or anything else, other than the maintenance of the old people, the produce and crops raised upon the place would belong absolutely to the plaintiff.

" That if the jury find that such an agreement for support and maintenance was entered into between plaintiff and his father, and that plaintiff had performed his part thereof for a period of five years and over, the absence of the plaintiff for six weeks, with the consent of the father, so long as there was money and means enough left with his parents by plaintiff to support their necessary wants, did not divest the plaintiff of his title to the crops which he had put in on said farm, or the personal property which may have belonged to him at the time of his departure, and which was the produce and fruit of plaintiff's labor on said farm.

" That if the jury find that such arrangement was made by plaintiff for the support and maintenance of his father and mother, and that plaintiff was also to have the use of certain personal property during the lives of his said father and mother, and actually took possession of the same, and used the same, he had such an interest in said personal property that his father could not divest him of such interest by a sale of said property while said plaintiff was absent for a few weeks, if the father consented, if said plaintiff had maintained and supported his father and mother for five years and upwards, and during his absence he had left ample means and money to provide for their support.

" That if the jury find that plaintiff was put in control of said farm and a quantity of personal property, and, in consideration of the use of the same and said farm, he was to maintain and support his father and mother in a suitable manner while he continued in possession of said farm and personal property, and did continue to support and maintain his said father and mother, all crops, and all the proceeds of said farm, and the fruits and proceeds of said personal property, belonged absolutely to plaintiff; and, if taken away and converted by this defendant, trover lies therefor, and plaintiff would be entitled to recover the value of the property at the time of the conversion of the property, with interest from that date down to the present time, deducting therefrom what it was reasonably worth to harvest and take care of the same and thresh the same.

" If, during the continuance of the occupancy of said farm while plaintiff was maintaining and supporting his said father and mother, you find that plaintiff purchased, with

the proceeds of his labor in cultivating said farm, a wagon, buggy, and other property, bought by said plaintiff in his own name, the same became the plaintiff's own property; and if taken and converted by defendant in this suit, trover would lie, and the plaintiff would have the right to recover the value thereof at the date of the conversion, with interest from that date to the present.

"In view of some of the testimony in the case, gentlemen, I further charge you that, if you find that any of the property in controversy was to remain on the farm during the life-time of the father and mother, and was not to become exclusively the property of the plaintiff until both his father and mother were dead; and if you find that the plaintiff never intended to abandon the farm, nor the property, nor his contract with his parents, but was induced by his brother, Pat, and the defendant to do so, upon representations that he would be sent to the State prison for the charge made against him; and if you find that he believed this, and, with his father's consent and knowledge, he absented himself for a time, until his father could arrange the difficulty; and if you find that during that time the defendant took possession of said property, and appropriated it to his own use, without having paid any consideration therefor,—then I charge you that, as against this defendant, said plaintiff had such interest in the property as would entitle him to maintain trover, and plaintiff would be entitled to recover the value of such property at the time of the conversion, deducting therefrom what it would be reasonably worth to harvest the same and thresh the same, and any other expenses incident thereto, which, as farmers, you can judge of as well as anybody else; and from such amount found, after making the deduction, you will add interest from about October 1, 1886, to the present time."

We think the law was correctly laid down by the court, under the circumstances of this case.

The contract between the plaintiff and his father, as claimed by plaintiff, was one that might have been executed within one year from the time it was made. It was not within the statute of frauds. *Hill v. Chambers,* 30 Mich. 422; *Sword v. Keith,* 31 Id. 247.

We find no error in the proceedings. It appears very plainly, from what evidence there is in the record, that the

plaintiff took the best of care of his father and mother for all the years before he went away in June, 1886; that he not only went away with his father's consent, but by his advice, and that of his brother and defendant. When he came back, it was the defendant who pushed the old charge against him to trial. McCarthy admits he procured his arrest after his return. When he came out of the Ionia prison, his brother, Patrick Carr, procured his arrest for breaking open the house on the place; the plaintiff having got his mother, and gone back there to live. After this second arrest, Patrick took his mother away with him to his home in Mount Pleasant, and dropped the prosecution against plaintiff. Patrick says:

"I did not want him put in jail, but just wanted to get him out of the house long enough to get my mother out of there."

The deposition of the mother, taken at Mount Pleasant, is most favorable to plaintiff. She says he took very good care of her, and that she has seen more trouble since her husband died than ever before. No one can read this record without being satisfied that Patrick Carr and the defendant conspired together to induce plaintiff to run away, and to get his property for little or nothing; that they are responsible for his being imprisoned, and have heaped other indignities upon him.

In this suit he has only regained his own, and less than his own.

The judgment will be affirmed, with costs of both courts.

SHERWOOD, C. J., CHAMPLIN and LONG, JJ., concurred. CAMPBELL, J., did not sit.