## Howard et al. v. Mitchell et al.
(Decided March 27, 1936.)

430

BEN D. RINGO and F. A. ROBY for appellants.

HERMAN A. BIRKHEAD, KIRK & BARTLETT and CARY, MILLER & KIRK for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The subject-matter of this controversy is six-sevenths of a tract of land in Ohio county, Ky. The plaintiffs on March 13, 1930, began this action by filing their petition in equity against Thomas R. Howard and his vendees, Roy Mitchell and T. F. Birkhead, in which petition the plaintiffs sought to have this tract sold for the purposes of partition and incidentally to quiet their title thereto. Thomas R. Howard was dismissed on demurrer, and on October 13, 1930, he died, and no one on behalf of him, his estate or his heirs, is a party to this appeal. The trial court decided in favor of Thomas R. Howard's vendees, dismissed the petition, and the plaintiffs have appealed.

### History of This Title.

It is claimed this land is a part of the Fielding Lewis 10,000-acre survey, 3,000 acres of which were involved in the case of Charles Goodwin and Nineteen Others v. Squire L. Taylor and Thirty-One Others, a partial transcript of which may be found in the record of Combs v. Ezell, vol. 9, p. 221 et seq., begun October 2, 1873, and terminating in a judgment for the defendants on June 11, 1881. At one time Lucius Howard was in possession of this land and claimed to own it. He died intestate in 1888, and the plaintiffs claim this land by inheritance from him.

### The Claims Asserted.

The defendants claim that Mary E. Howard, the widow of Lucius Howard, occupied this property after

Lucius Howard's death under a claim of ownership in herself, and so held it adversely to all the world until she sold it to Thomas R. Howard, and that he, after acquiring all the title she had, himself held it adversely to all the world until he sold it to the present appellees, and this sale they assert vested them with perfect title, while the plaintiffs assert their mother remained in possession of this land as the widow of Lucius Howard until her death in 1921, and that Thomas R. Howard and the appellees have been in possession since then as the cotenants of the plaintiffs.

## Lucius Howard's Descendants.

For the convenience of the reader, we have prepared a table of the descendants who survived Lucius Howard in which we have listed them in the order of their birth, and following the names of his children, wherever the record shows such, we have given in parentheses the age of such child at the time of the death of Lucius Howard and the figure written beneath any of the names of this family indicate such member is dead and the date of that death:

|  |  |  |
|---|---|---|
| Lucius Howard 1888 and Mary Howard 1921 | Thomas R. Howard Oct. 13, 1930 | |
| | Frances J. Smith (23) | |
| | Philipp J. Howard | |
| | Ellen Howard (16) | |
| | Louise Cauley (14) | |
| | Appalona Boone (10) | |
| | James Howard (5) 1928 | Verna Howard Bertha Long Estil Howard Coleman Howard Charles Howard Rommie Howard Virgie Howard All these children of James Howard are infants. |

With the exception of Thomas R. Howard, all of these together with the spouses of those that are married joined as plaintiffs, the infants suing by their mother, Agnes Howard (widow of James Howard), as their next friend.

## Lucius Howard's Title.

Lucius Howard had no title of record. There is

some showing that years ago Richard Howard owned this land by some sort of a title. He gave this land to his son, Wash. Howard, and gave other land to his son, Lucius Howard. These two exchanged properties, and in that manner Lucius Howard came into possession of the land in question, but just when does not clearly appear.

There is some evidence Lucius Howard was in possession of it as early as 1864, while other evidence definitely places his first possesion at about the year 1880. When his possession first began we need not decide, for the result will not thereby be affected.

All admit he was in possession and was living there with his family and claiming it as his own when he died in 1888, and from this record we conclude his possession with claim of ownership and occupancy was then but 8 years old. We shall therefore consider this case upon the basis that his possession with claim of ownership began in 1880.

We will find it easier to straighten out this tangled skein by starting at the beginning and straightening it out as we come this way.

All we find to start on is that Lucius Howard was claiming it as his own and was in possession when he died, and had been so for 8 years.

That raises a rebuttable presumption of ownership, which, in the absence of evidence to the contrary, the law will assume to be correct. See 22 C. J. p. 126, sec. 65, note 69; East Jellico Coal Co. v. Hays, 133 Ky. 4, 117 S. W. 307, 34 Am. St. Rep. 436; Moxey v. Day, 1 Ky. Op. 74. See, also, 10 R. C. L. p. 876, sec. 21.

Possession is prima facie evidence of title. Payne v. Edwards, 188 Ky. 302, 221 S. W. 1073; Ratcliff v. Iron Hill Furnace & Mining Co., 9 Ky. Op. 345.

Since Lucius Howard and Mary E. Howard were husband and wife, it might be suggested it would be as logical to assume this land belonged to her as that it belonged to him, but, where there is a joint possession in a husband and wife and there is either no evidence or the evidence favors one as much as the other, the courts uniformly hold that the ownership is in the husband. Curran v. McGrath, 67 Ill. App. 566; Hill v.

Chambers, 30 Mich. 422; McClain v. Abshire, 63 Mo. App. 333; and Karch's Estate, 133 Pa. 84, 19 A. 311. However, the evidence here is not equiponderant, and such as there is all favors the ownership by Lucius Howard, and we shall therefore assume he died the owner of this property in fee simple, since, for all we know that old man, if he had, while living there, been disturbed in his possession, might have been able to show connected paper title from the commonwealth. There is no satisfactory evidence he did not have such.

The conduct of all the world since then has been entirely consistent with his absolute ownership, and the present doubt may all be due to his failure to have recorded the evidence of title that he then had. This is the same reasoning upon which the opinions of this court were rested in Morgan v. Moseley, 206 Ky. 72, 266 S. W. 876, and Jarboe v. McAtee's Heirs, 7 B. Mon (46 Ky.) 279.

From the assumptions made it follows that, when Lucius Howard died, his widow, Mary E. Howard, was entitled to dower in the property in controversy (see sections 2 and 4, art. 4, c. 52, General Statutes), and until dower was assigned to her she had quarantine therein (see section 8, art. 4, c. 52, Gen. Statutes), or she was entitled to a $1,000 homestead therein (see section 13, art. 13, c. 38, Gen. Stats.). Those statutes were then in force, and what Mary E. Howard then took must be determined by the statutes in effect when she took.

### What the Widow Did.

Left as she was with this farm, shown to be hilly and poor, with five infant children (the two eldest had gone) the widow figuratively kept her seat, she called her brood about her, and they began the awful struggle of getting a living for herself and the children from this worn and hilly homestead. She succeeded in keeping them alive and rearing them, but was unable to educate them, and they cannot read or write. She struggled on for 23 years; then on November 3, 1911, by a deed recorded October 13, 1919, she attempted to convey the farm to Thomas R. Howard, that deed containing this as the only consideration therein recited:

"In consideration of keeping the said Mary E. Howard her life paying all doctor bills and *berial* expenses."

It is contended the old lady by this deed passed to her son a fee-simple title, but the effect of it, if it conveyed anything, was only to convey what she had. Section 2351, Ky. Stats., and section 2291, Id.

The provision of section 13, art. 13, c. 38, Gen. Stats., was:

> "Such exemption in favor of an execution debtor, or one against whom judgment has been rendered, shall continue after his death for the benefit of his widow and children, but shall be estimated in allotting dower."

In construing that statute in Gasaway, etc., v. Woods, etc., 9 Bush (72 Ky.) 72, this court held:

> "If one third of the deceased debtor's land is of less value than one thousand dollars, the widow is entitled to have allotted to her, as for her dower, so much of the land, including the homestead, as was of the value of one thousand dollars."

To that the court adhered in Eustache v. Rodaquest, etc., 11 Bush (74 Ky.) 42; Miles, etc., v. Hall, etc., 12 Bush (75 Ky.) 105; Gay v. Hanks, 81 Ky. 552; and Lancaster v. Redding, 26 S. W. 1013, 16 Ky. Law Rep. 147.

These cases clearly establish that the rule then was that a widow was entitled to a homestead of $1,000 not only against her husband's creditors but also against his heirs. The law presumes citizens do right rather than wrong, and, since Mary E. Howard had the right to occupy this property as the widow of Lucius Howard, it will be presumed she did so occupy it; hence her occupation was not adverse, but was a friendly occupation, and inured to the benefit of the children of Lucius Howard, rather than their hurt. Mills' Heirs & Dale v. Bodley, 4 T. B. Mon. (20 Ky.) 248; Driskell v. Hanks, 18 B. Mon. (57 Ky.) 855; Frazer v. Naylor, 1 Metc. (58 Ky.) 593; Clayton v. Clayton's Ex'r, 12 S. W. 312, 11 Ky. Law Rep. 472; Scott v. Proctor, 13 S. W. 790, 12 Ky. Law Rep. 57; Carter v. Monarch, 171 Ky. 345, 188 S. W. 379.

There is no proof this land was then worth as much as $1,000, and every indication is to the contrary, therefore the widow could occupy the whole of this land as long as she chose to do so, and the children of Lucius

Howard occupied the position of remaindermen to whom this land would come whenever the widow ceased to occupy it, and, since she began to. occupy it under claim of right as the widow of Lucius Howard, it must be presumed she continued so to occupy it. Hence all the remaindermen had to do was simply wait until her occupation ceased.

There is some attempt to show Mary E. Howard claimed this farm as her own, but no matter how often, how loudly, how long, or how openly she may have proclaimed her ownership, her estate was not thereby enlarged. Superior Oil Corporation v. Alcorn, 242 Ky. 814, 47 S. W. (2d) 973. The children of Lucius Howard owned this farm, but they could not take possession of it because of the right of occupancy which the law vested in their mother. So long as she chose to occupy it, all these children could do was to wait. Hers was a friendly occupation, to which these children could not put an end. Limitation never runs against a man unless he can stop it. Superior Oil Corporation v. Alcorn, supra.

### Was This Homestead Abandoned?

We come next to a determination of the effect of the deed made by Mary E. Howard to Thomas R. How-ard. We had a very similar question before us in the case of Rothwell v. Rothwell et al., 104 S. W. 276, 277, 31 Ky. Law Rep. 851. In that case Thomas Rothwell owned 100 acres of land which he occupied as a homestead. He conveyed the land to his daughter, Elizabeth Rothwell and to William Rothwell and others, the grandchildren of Thomas Rothwell, the grantor reserving to himself " 'the rents, issues, and proceeds' of the land 'for and during his natural life for his maintenance and support.' " A creditor attempted to seize the land under execution, and this court said:

"It is not material whether this language be construed as retaining a life estate to the grantor, or simply that the land was to be charged with his support. In either event it did not amount to a waiver or loss of his right to the homestead."

In the case of Murphy v. Crouch, 24 Wis. 365, the Supreme Court of Wisconsin had this identical question before it. Crouch was a struggling debtor living with

his wife on a 40-acre homestead. Both were old and feeble. In 1857 Murphy obtained a judgment against Crouch. He was unable to collect it. In April, 1864, Crouch and wife conveyed this 40-acre homestead to their son, Nicholas Crouch, on condition that he live with them and furnish them, as long as either should live, with good and comfortable boarding and lodging, all necessary clothing and medical care and assistance during sickness. In December, 1866, Nicholas, having become tired of this arrangement, reconveyed the 40 acres to his father. Murphy, regarding this sale to Nicholas as an abandonment of the homestead, had an execution issued on his judgment, and the 40 acres were sold. The elder Crouch sued to annul the sale. He succeeded. Murphy appealed, and, in affirming this judgment, the court held the conveyance to Nicholas was not an abandonment of the homestead, but was merely a means of applying the homestead more effectually to the support and maintenance of its aged and infirm owner.

Mrs. Howard did not abandon this homestead by the deed she made to Thomas R. Howard; she was merely arranging for what she hoped would give her a surer and more comfortable enjoyment of it, and her use and occupation of this property continued until her death in 1921.

### Thomas R. Howard's Occupation.

There is evidence that in 1890 Mrs. Howard arranged with Thomas R. Howard to come there and live with her and take care of her and that he continued to live on this property until he sold to the appellees on September 6, 1927. So long as his mother lived he was, so the evidence shows, living there under some arrangement with her, and, after she made the deed to him, on November 3, 1911, we know exactly what that arrangement was. He was simply her tenant.

After his mother's death, Thomas R. Howard, as one of the heirs of Lucius Howard, owned one-seventh of this property; he had as much right to occupy it as any of the other six had. He was their cotenant, and they could not have dispossessed him, and, after he sold to the appellees, they became the cotenants of the appellants, and they have since so continued. During all this time the statutes of limitations have never started, for limitation never starts to run unless the party against whom it is asserted can put a stop to it.

So long as Mary E. Howard lived, she could have defeated any suit these children might have instituted by pleading her homestead, and, after her death, Thomas R. Howard or these appellees, by pleading their ownership of one-seventh of this property, could have defeated any suit brought against them except one like this brought for partition. In Superior Oil Corporation v. Alcorn, 242 Ky. 814, 47 S. W. (2d) 973, we said:

> "A remainderman does not have to sue for possession and hope the rights under the life estate may not be asserted against him, he is not required to sue, until as a reasonably prudent man he knows such rights have been ended either by death or unequivocal renunciation and cannot be asserted against him."

Appellees regard all this as fallacious. They assert Lucius Howard was simply squatting on this land, claiming to own it and had been so for but 8 years, and from that they conclude he had no title whatever. They may be right about their facts, but they are in error about their conclusions.

### The Estate of an Adverse Possessor.

Courts have never definitely agreed just what estate an adverse possessor has, and we shall not go very far into that field of inquiry, but at least he has some sort of an estate, some sort of an ownership, for he has something which the courts will protect, and the protection of the courts is the very essence of ownership. See Ohio Valley Fire & Marine Ins. Co.'s Receiver v. Skaggs, 216 Ky. 535, 287 S. W. 969, and 50 C. J. 778.

It has been called a "Conditional ownership," Crochet v. McCamant, 116 La. 1, 40 So. 474, 114 Am. St. Rep. 538; an "Imperfect ownership," Mott v. Hopper, 116 La. 629, 40 So. 921; "Inchoate title," Wickes v. Wickes, 98 Md. 307, 56 A. 1017; "Growing title," etc. We see no need that we should give it a name or definitely say here just what estate an adverse possessor has. In his Commentaries, book 2, p. 195, Blackstone says: "It is the lowest and most imperfect degree of title." Notice he calls it a degree of title. We are simply deciding the case before us, answering only those questions we must answer in order to decide it.

An adverse possession is wrongful in its inception,

it is a continuing wrongful trespass, but the courts will protect such a trespasser against all the world except the true owner. Deaton v. Burton, 142 Ky. 7, 133 S. W. 958; Zella Mining Co. v. Collins, 203 Ky. 178, 261 S. W. 1090; Hall v. Deaton, 68 S. W. 672, 24 Ky. Law Rep. 314; Crate v. Strong, 69 S. W. 957, 24 Ky. Law Rep. 710; 63 C. J. p. 910, sec. 28. While the way of the disseizor is hard, still the courts do not treat him as an outlaw.

When he died, the adverse possession of Lucius Howard had continued for 8 years. As against the true owner, that 8 years would have been of no more avail than eight seconds, but the true owner, if there were such other than Lucius Howard, has never appeared, and hence Lucius Howard died with at least a vague sort of ownership in this farm.

A man's estate is that which he can sell or dispose of at his pleasure. It is what he can pass on to another. Lucius Howard could have sold his right in this land or could have devised it by will (see sections 1 and 2, c. 24, and section 6, art. 1, c. 63, Gen. Stats., now sections 490 and 2341 Ky. Stats.), and his grantee or devisee by 7 years of further adverse possession tacked on to Lucius Howard's 8 could have brought this estate to full perfection and acquired a perfect title. See Mills' Heirs, etc., v. Bodley, 4 T. B. Mon. (20 Ky.) 248.

Lucius Howard did neither, and by section 1393, Ky. Stats., section 1, c. 31, Gen. Stats., his estate in this farm descended to his seven surviving children, subject to such rights as his widow, Mary E. Howard, may have had therein.

It was an estate in land of which he died possessed, for there is a plain and marked distinction between an estate in land and a title to land; the former refers to the interest Lucius Howard had; the latter to the evidence of his right, the extent of his interest, or the means whereby he is able to assert, maintain, or continue his possession. 21 C. J. p. 916, sec. 1.

In all probability, Lucius Howard was the true and rightful owner of this property, and this controversy may be the result of the failure of him and his grantors to procure and to record their title papers. However, we are proceeding now upon the idea that he had merely

entered on this farm and wrongfully taken possession of it in 1880, and considering his rights as such.

## Tacking.

Whatever we may call what he had, inchoate title, adverse possession, or disseizin, he had, as regards this farm, a recognized legal status, and no one could dislodge him but the true title holder. Such rights have definite legal recognition, they are bought and sold every day, are passed by deeds and wills and by oral contracts, the grantees or devisees succeeding to the rights of their grantors or devisors by what is known as "Tacking," and this right was a definite part of the estate of Lucius Howard.

Corpus Juris, vol. 2, p. 82, sec. 66, says of such a process:

"It does not follow from anything heretofore said that continuous possesion in any one person is necessary for the acquisition of title by adverse possession. On the contrary it is a rule of almost universal application that, if there is privity between successive occupants holding adversely to the true title continuously, the successive periods of occupation may be united or tacked to each other to make up the time of adverse holding prescribed by the statute as against such title. 'Practically all statutes of limitation of the country relating to the recovery of land,' it has been said, 'permit the tacking of possessions, as did the parent English statute,' and some statutes have in express terms authorized it. By disseizin the desseizor acquires an inchoate title in and to the land of which he becomes possessed which is so far recognized by the law that he can transmit it to those in privity with him." See, also, 1 R. C. L. p. 687, sec. 3.

We now refer to article 13, chapter 38, of the Gen. Stats., dealing with executions and homestead and other exemptions, particularly to section 14 thereof, giving a homestead to the widow and the unmarried infant children.

That gave Mrs. Howard a right to stay there; that gave her a right "to keep her seat." A homestead right is not an estate in land, but is an exemption from execution; it can attach to any real property susceptible of present occupation that can be seized under an execu-

tion. It is hard to conceive of an interest that is not subject. See sections 490, 1681, and 2341, Ky. Stats. The nature or quantum of the estate in which the homestead is claimed is immaterial. See Turner v. Browning's Adm'r, 128 Ky. 79, 107 S. W. 318, 32 Ky. Law Rep. 891. A fee-simple title is not necessary to the right of homestead. 29 C. J. 1021, sec. 513.

When Lucius Howard died, he certainly had something to which his widow's right of homestead could attach, and she, being in privity with her husband by holding that homestead, thereafter has brought this title to indefeasibility by a process known as tacking. Mills' Heirs, etc., v. Bodley, 4 T. B. Mon (20 Ky.) 248; Shannon v. Kinney et al., 1 A. K. Marsh. (8 Ky.) 3, 10 Am. Dec. 705; Beal v. Brooks' Ex'rs, 7 J. J. Marsh. (30 Ky.) 232, 23 Am. Dec. 401; Miniard v. Napier, 167 Ky. 208, 180 S. W. 363; Tippenhauer v. Tippenhauer, 158 Ky. 639, 166 S. W. 225; 2 C. J. p. 88, sec. 79; 1 R. C. L. p. 717, sec. 31.

One of the oft-cited cases on the subject of tacking is a case decided by the Supreme Court of Pennsylvania, Overfield v. Christie, etc., 7 Serg. & R. 173, in which these were the facts:

The land was patented to Joseph Wharton on August 17, 1784. He sold it on June 7, 1813, to the appellant, Jacob Overfield, who found this situation when he went to occupy it: That Nathan Abbott had made a settlement and an improvement on the property in 1788, had lived there 4 years and sold it to Lazarus Ellis, who after living there 5 years, sold it to Peter Osterhout, his son-in-law, who lived there until he died, and was succeeded by his son Hugh Osterhout and by his widow, Jerusha Osterhout, who by a later mariage became Jerusha Christie. Overfield sued Mrs. Christie and her son Hugh Osterhout in ejectment. They defended upon their more than 21 years of adverse possession. They were successful. Overfield appealed, and, in affirming the judgment, Chief Justice Tilghman said:

> "As to privity between trespassers. If one enters and commits a trespass, and then goes off, and another comes after him, and commits a trespass, I grant, that there is no privity between these persons, nor can the possession be said to be transferred and continued from one to the other; but I can-

not see that the present case falls within that principle. Here has been a possession of four or five and twenty years, transferred in the two first instances, for a valuable consideration, and finally transferred from father to son; each new possessor has been substantially connected with his predecessor. The law pays great regard to a possession transmitted from father to son; so great, indeed, that where there was a disseisin, and a descent to the heir of the disseisor, the entry of the disseisee was, at common law, taken away. * * * Our law permits all persons, whether in or out of seisin or possession, to transfer their claim, such as it is, good or bad, by deed or will. And I have no manner of doubt, that one who enters as a trespasser, clears land, builds a house and lives in it, acquires something which he may transfer to another; and if the possession of the two, added together, amounts to twenty-one years, and was adverse to him who had the legal title, the act of limitations will be a bar to his recovery. * * * When possession has been continued for a number of years, and has passed from hand to hand, for valuable consideration, or by descent from parent to child, it has something respectable in it.''

This title of Lucius Howard having thus by his widow's possession been brought to indefeasibility, the result that follows is the same as that set out in earlier parts of this opinion, so it really makes no difference how long Lucius Howard had been living on and claiming this property when he died; the result is the same whether he had been there for 24 years or 24 hours, so long as he was there and was claiming ownership when he died, and all the proof shows he was.

### Quieting Title.

The appellees insist the appellants had no right to maintain this suit because they asked to have their title quieted and were not in possession; but the appellees are in possession, and their possession is the possession of their cotenants, the appellants, and, besides, that the appellants are asking for a sale of this property for the purpose of partition. They have the right to maintain this action for that purpose. See subsection 2, section 490 of Civil Code of Practice. We construed that

section in Ward v. Edge, 100 Ky. 757, 39 S. W. 440, 443, 19 Ky. Law Rep. 59, and we held the heirs of Walter Ward could maintain an action for partition of the land there involved, although Daniel T. Ward was in possession of it, and there we said:

"The construction placed by appellant upon the words 'estates in possession' is not the legal construction placed on these words. In the case of May's Heirs v. Slaughter, 3 A. K. Marsh. (10 Ky.) 505, 508, the court held: 'the words "possession," "reversion," or "remainder" are used as descriptive of the nature of estate, or of its tenure, and not as describing the peculiar situation in which the land itself might be, with regard to intrusions upon it by strangers.'" Of a situation similar to this in Kentucky Fluorspar Co. v. Pierce's Ex'rs, 184 Ky. 573, 213 S. W. 542, 544, we said: "As the plaintiffs and the defendant company were cotenants in the real property sought to be sold, the possession of the Fluor Spar Company was the possession of the plaintiffs."

Appellants have a right to the relief they seek, and as an incident to that the court should quiet their title by adjudging Frances Smith, Philipp J. Howard, Ellen Johnson, Louise Cauley, and Appalonia Boone to each be the owner of one-seventh of this property, that the children of James Howard own one-seventh and the appellees own one-seventh between them, and the property should be sold for partition.

Judgment reversed for judgment as indicated.

The whole court sitting.