IN THE

# SURROGATE'S COURT

OF THE

# COUNTY OF NEW-YORK.

BEFORE ALEXANDER W. BRADFORD, SURROGATE.

## KELLY vs. McCARTHY.

## *In the matter of the Estate of* CATHARINE CALLAHAN, *deceased.*

The intestate was a feme covert, married before the passage of the act "for the more effectual protection of the property of married women." After that act took effect, she acquired leasehold premises, and executed a mortgage thereon to secure the payment of one thousand dollars. She died, and then her husband died also, and his administrators disputing the validity of the mortgage, it was *held* valid.

Marriage, though a civil contract, is also a civil institution under the regulation and control of the State. Vested rights in the property of the wife already acquired under the law regulating the marriage contract, cannot be disturbed by legislative authority, but it is competent for the legislature to modify the incidents of the marriage relation in respect to property to be acquired after the change of the law.

Marriage is not in all respects and as to all incidents and regulations existing by law at the time of celebration, such a contract in the strict sense of the term as to embrace and continue for a law between the parties, all those incidents and regulations, notwithstanding subsequent legislative modification.

By the laws and usage of this State, the wife can convey without her husband joining with her in the conveyance.

If the wife acquire property in her own name with the assent and cognizance of her husband, her right and title will be upheld, unless the claims of creditors are in question.

J. W. WHITE, *for the Administrators.*

THE SURROGATE. The intestate was a married woman, and during coverture had taken as a feme sole an assignment of certain leasehold premises, and executed a mortgage on the premises to secure the payment of one thousand dollars. After her decease, her husband died also, and his administrators contest the validity of the mortgage. The Act for the more effectual protection of the property of married women provides that the same may be received and held to their sole and separate use—be their sole and separate property—and be devised or conveyed in the same manner and with like effect as if they were unmarried. The effect of these provisions is to give a married woman an unlimited control over her property. (*Am. Home Missionary Society* vs. *Wadhams*, 10, *Barb.* 597.) She has the same power of disposition as if she were unmarried : in other words, she can act without the conjunction or interference of her husband, and to make the act valid it is not necessary for him to unite in the act, or consent to it.

In the present case, the parties were married before the passage of the Act of 1848, but the property was acquired after. The provisions of this Act have been the subject of construction by the Supreme Court, but I am not aware that the point has been decided which arises in this case, as to the constitutionality of the law in respect to previous marriages. In *Snyder* vs. *Snyder*, 3 *Barbour. S. C. R.*, 621, Justice Harris said : " Suppose a female, married at the time of the passage of the act, should subsequently acquire property by inheritance, such property would not be subject to the disposal of her husband."

Justice Barculo, in *Holmes* vs. *Holmes*, 4 *Barbour.*, 295, maintained that marriage is such a contract as to render the law existing at the time of marriage, in respect to the interests of husband and wife in future property as sacred

and inviolable as if they had been made the terms of an express agreement. In that case, however, the right of property in controversy, was vested in the wife before the passage of the act—a sufficient ground upon which to sustain the decision of the court. In 5 *Barbour's S. C. R.*, 474, Justice Maison, in the case of *White* vs. *White*, though deciding that the act, so far as relates to rights of property existing at the time of its passage, was unconstitutional, expressed the opinion, nevertheless, that marriage was not " a contract in the strict common law sense of· that term." In *Hurd* vs. *Cass*, 9 *Barbour, S. C. R.*, 366, there had been marriage previous to the act, and acquisition of property subsequent to the act; it was not contended that the contract had been violated by the act, but the court held that *though during her life the wife was sole owner*, on her decease her husband had an estate as tenant by curtesy, it not having been the design of the statute to interfere with the law of descent. In *Perkins* vs. *Cottrell*, 15 *Barbour's S. C. R.*, 447, where it was held that the act was not intended to apply to previously acquired property, it was not urged that the marriage contract reached all subsequent acquisitions, so as to place it beyond the power of the legislature to alter the relative rights of husband and wife.

Though marriage is a civil contract, it differs from other contracts in being also a civil institution. It lies at the very basis of society, and the State is interested in its regulation. In respect to rights, duties, and obligations, the will of the parties is not supreme, but is subject to those rules of social and moral order which the law has seen fit to impose. Thus it still continues' to subsist, though one of the parties has become incapable of performing his part of the compact. It cannot be dissolved by mutual consent. In cases of other contracts, these rules would be esteemed grossly unjust; in respect to marriage, they are recommended by the highest considerations of morals and humanity.

It is evident also that the relations and conduct of husband and wife are of such concern to the State, that the

law of the place where they reside cannot be made entirely subservient to the law of the place where the contract was made. If marriage be such a contract as to imbody in it all the laws respecting husband and wife existing at the time of its creation—so that those laws are part of the contract just as much as if they were expressed in a written agreement, then it is obvious that parties domiciled and married abroad may import into any country to which they may have changed their domicil, laws utterly repugnant to its social policy and institutions. This is aptly illustrated by the question of Lord Robertson—"if a man in Scotland were to confine his wife in an iron cage, or to beat her with a rod of the thickness of the judge's finger, would it be a justification in any court to allege that these were powers which the law of England conferred on a husband, and that he was entitled to the exercise of them, because his marriage had been celebrated in that country?" Again, nothing relates more closely to the obligation of a contract than the mode and grounds of its dissolution. But if the *lex loci contractûs* governs, our courts would have to divorce parties married in France for reasons allowed there—or refuse to divorce those married in England, because the contract there is indissoluble. And as to capacity, would a wife residing in this State with her husband, be disabled from making a will because she was married in England, where the will of a feme covert is invalid. As to distribution, are parties domiciled here to take according to the law of the place where marriage was celebrated? And to approach nearer the direct question of property, is the *lex loci contractûs* in the case of a foreign marriage to govern in this State, after husband and wife have removed hither, as to property subsequently acquired? These various questions have been elaborately discussed, especially by the continental jurists, and with regard to most, if not all of them, the weight of authority is in favor of the supremacy of the *lex loci domicilii* over the *lex loci contractûs*, and on the obvious ground that there are many incidents of marriage not the subject of ex-

press contract, but flowing from municipal regulation, and dependent, therefore, except as to vested rights in property, upon municipal regulation for their continuance. So that as parties married in a foreign country cannot, on becoming domiciled here, be permitted under the plea of an implied contract, to import laws repugnant to our social regulations, neither can husband and wife married here, be permitted under a similar plea, to continue the law existing at the time of marriage, as peculiar to their own case, after it has been supplanted by a different system. Vested rights in the property of the wife, already acquired under the law regulating the marriage contract cannot, of course, be disturbed by an alteration of that law, but it is quite a different thing to modify the law as to the incidents of marriage in respect to property to be acquired after the change of the law. In one case, the new law would strip the parties of present ownership, in the other case it would only alter the regulations attending the relation of husband and wife. In one case, it would act on present property as well as the incidents of the marriage contract; in the other it would act on the incidents only and would not divest any interest in property, because there is no property to divest at the time. The law of distribution in case of intestacy illustrates this distinction. That law is of quite as much importance, as the rules regulating the relative rights of husband and wife in their life-time. And yet the distribution is governed by the law of the domicil at the time of death, and not by the law of the place where the contract of marriage was celebrated. The contrary doctrine has been urged on the ground of a tacit agreement at the time of the marriage. But what is that tacit agreement? Is it that the laws then existing shall be of universal and continuing obligation? Or is it not more reasonable to say, if there be a tacit understanding as to the incidents of marriage, that the parties agree to conform to the law as it may be from time to time? The power of the legislature to regulate the rights and duties of husband and wife is, generally speaking, undoubted, and that power itself may

come within the purview of the tacit agreement. (*Le Breton* vs. *Nouchet*, 3 *Martin*, 60 ; *Gale* vs. *Davis' heirs*, 4 *Martin*, 645 ; *Saul* vs. *His Creditors*, 17 *Martin*, 605 ; *Story, Conflict Laws*, §§ 111, 136, 138, 157, 171, 176. See 3 *J. Ch. C.*, 190.) " The doctrine of tacit contract to regulate the rights and duties of matrimony, in cases where there is no express contract," says Justice Story, " according to the law of the place where the marriage has been celebrated, is questionable in itself ; and even if admitted, must be liable to many qualifications and restrictions. We have seen that it has been much doubted in Louisiana; and the Scottish courts have utterly refused to allow the doctrine of such a tacit contract to regulate the right of divorce." (*Conflict Laws*, § 190.) I am inclined, therefore, to the opinion that marriage is not, in all respects and as to all incidents and regulations existing by law at the time of celebration, such a contract, in the strict sense of the term, as to embrace and continue for a law between the parties, all those incidents and regulations, notwithstanding subsequent legislative modification, and that it is competent for the legislature to alter the rule in respect to the rights of husband and wife in property subsequently to be acquired, without impairing the obligation of contracts, within the meaning of the Constitution.

Apart from this question, however, the mortgage executed by the intestate was a valid instrument, for though, at common law, the wife could not convey without her husband joining, by the laws and usages of this State she can. (*Albany Fire Insurance Company* vs. *Bay*, 4 *Coms. R.*, 9.) And as it appears the husband was cognizant of the acquisition of the property in question by the wife, in her own name, her right and estate will be upheld, unless the claims of creditors are in question. (*Borst* vs. *Spelman*, 4 *Coms. R.*, 284.) The representatives of the husband cannot claim against his consent and approval, especially when during his life he had made no efforts to assert a hostile title, or to repudiate the act of the wife. I conclude, therefore, that the mortgage is a valid charge on the leasehold estate, and must be paid.