W. P. S. Melvin, Referee.
The facts in the case are simple, and in the main undisputed, but the objections that are urged by the husband of the testatrix and her children are of the utmost importance. It appears that the testatrix, Clarissa E. Curtis, and James L. Curtis intermarried in the city of blew York on June 18, 1832. There were four children by the marriage, of whom two survive, namely, Clara Isabelle Curtis, born April 1,. 1833, and Julia Frances Munson, born September 19, 1838. Both these daughters unitedly file objections to the account of the executor, and their father, separately, and in his own behalf, files objections. The latter claims a right in the real estate left by his wife as tenant by the curtesy, and, further, that the entire personal estate left by his wife belongs to him, after payment of her debts and funeral expenses; and finally, that no distribution of the proceeds of the real or personal estate should be ordered on this accounting, and that no distribution of the proceeds of the real estate can be directed until after his death. His daughters, on the other hand, accepting the will of their mother, substantially limit their contention to this, briefly stated: That a certain bequest in their *132 favor should not be defeated .by devoting the property covered by the terms of the bequest to the payment oí taxes, assessments and other charges upon the real estate at the time of the death of their mother.
The material portions of the will of Mrs. Curtis, so far as this proceeding is concerned, are as follows: “ First. I give and be-, queath all my jewelry, laces, and other wearing apparel, and all my silver and plated ware, all my paintings, pictures, books, book-cases, and all my household goods, stores and furniture, to my daughters, Clara Isabelle Curtis and Julia Frances Munson, share and share alike, absolutely. In case either should die before me, her share to go to the survivor. Secondly. I direct my executor to pay all my debts and funeral expenses. Thirdly. In the event of a sale in my life-time of my real estate'situated between 107th street and 108th street and the Boulevard and Riverside park, in the city of New York, or, in the event of a sale after my death, then after such sale, and from the proceeds thereof, I give an annuity of twelve hundred dollars to my husband, James L. Curtis. Fourthly. All the rest of my personal property owned by me absolutely, amounting now to about twenty-six thousand dollars, and except the proceeds of said plot of real estate, I give and bequeath to my executors hereinafter named, in trust to receive and .collect the income, interest, dividends, and profits thereof, and to apply the same to the use of my daughters, Clara Isabelle Curtis ancl Julia Frances Munson, during their lives, share and share alike, and to the survivor for life. Fifthly. I give, devise and bequeath my plot of real estate, or the proceeds thereof, if sold before my death, to my said executors, in trust to divide the same into eight equal portions, and to receive and apply the rents, interest, income, dividends and profits of (3) three of such portions to the use of my daughter Clara Isabelle Curtis during her life; and of (3) three other of said portions to the use of my daughter Julia Frances Munson during her life; and of one of said portions to the use of' my granddaughter Edith Hastings during her life ; and of the remaining portion to the use of my grandson Ernest Hastings during his life. Sixthly. I give and bequeath from the proceeds of the sale of my above-specified plot of ground (£500) five hundred dollars to Eliza Fitzpatrick, and ($500) five hundred dollars to Elizabeth S. Higgins, who have been my dressmakers for many years.” Then follows a bequest of “all the respective remainders upon the respective life-estates in the real and personal property hereinbefore created ” to certain residuary legatees, coupled with a power of sale to her executors, or the one who should qualify, at such time as they may deem fit. This will was made or dated March 30, 1882. At the time of the death of Mrs. Curtis she owned considerable personal property. All of it was included under the terms of the first of the foregoing bequests, except a block of railroad stock inventoried by the executor as 250 shares of the capital stock of the New York Central & Hudson River Railroad Company at a value of $26,250, besides a sum in cash, namely, $2,420.43.
(1) Now, asto the real estate left by the testatrix. It appears that *133 on the 29th day of December, 1856, Mr. Curtis executed, under seal, a deed of bargain and sale to Eastburn Hastings, in consideration of the sum of $25,834.33, of eight lots on One Hundred and Eighth street, in the city of Hew York, and also of thirty-one other lots in the same vicinity. The conveyance was made subject to a number of mortgages, the amount of which formed part of the consideration, and the receipt of which consideration was in ordinary terms “hereby acknowledged.” Afterwards, on the 30th day of December, 1856, Eastburn Hastings made a like deed, under seal, to Clarissa Emma Curtis, the wife of James L. Curtis, for the very same consideration named in the deed to Mr. Hastings, conveying the same property subject to the same mortgages, which likewise formed part of the consideration, the receipt of which was also in terms acknowledged. These deeds were properly delivered, and Mr. Curtis procured the same to be duly recorded. He testified, moreover, that the object in making the transfers was to secure his wife and his children against the contingency of his sudden death or future possible business embarrassments. He admitted that the title was not in him, and that Mrs. Curtis continued in the undisturbed possession of the property as “ all was very comfortable with ourselves.” Some testimony was presented in this proceeding on the part of Mr. Curtis which showed that the consideration named in the deeds was not paid by either Mr. Hastings or Mrs. Curtis, but, if this testimony was offered for the purpose of annulling the deeds, it cannot avail. “A man is estopped by his deed to deny that he granted or that he had a good title to the estate conveyed, but he is not bound by the consideration expressed, because that is known to be arbitrary, and is frequently different from the real consideration.” Wilkinson v. Scott, 17 Mass., 249. He is estopped from alleging that the deed was executed without consideration, though he may explain or vary it by paroi proof. McCrea v. Purmort, 16 Wend., 460. “ In a conveyance by bargain and sale, there must be some good consideration given, or, at least, said to be given, for the land; and if the deed makes mention of money paid, as in consideration of £100 or the like, and in truth no money is paid, yet the bargain and sale is good.” Shep. Touch., 222; Fisher v. Smith, Moore, 569; Chiles v. Coleman, 2 A. K. Marsh., 298; Bank v. Housman, 6 Paige, 526. But it is likely, however, that the testimony relative to the non-payment of the price mentioned was introduced not for the purpose of annulling the deeds, but rather to present in a strong light the idea of the contestant that these deeds operated, in effect, as a conveyance from husband to wife, and hence were not entitled to the favor of the law. It is proper, then, to consider the force of the objection of Mr. Curtis that his wife could not, by her last will and testament, defeat his alleged life-estate in this realty, as tenant by the curtesy; and this involves an examination of the terms of the statute which enabled women to hold property free from the ® control of their husbands, and conferred upon them power to devise the same as if they were unmarried. Its language is, Laws 1848, chap. 200, as amended by Laws 1849, chap. 375; “ Any *134 married female may take by inheritance, or by gift, grant, devise, or bequest, from any person other than her husband, and hold to her sole and separate use, and convey and devise, real and personal property, and any interest or estate therein, and the rents, issues and profits thereof, in the same manner, and with the like effect, as if she were unmarried.”
In the first place, then, are these two deeds, in effect, a conveyance from Mr. Curtis to Mrs. Curtis ? That may have been the effect, but with the language of the statute before us, and technically, we must say that it was not a conveyance such as the law excepted from its beneficent provisions. At the time these deeds were made it was the careful endeavor of the parties that they should not conflict with this statute. It was a question, Mr. Curtis testified, whether he had the right to convey property directly to his wife, and hence it was to obviate this objection that Mr. Hastings was selected as the intermediary. Direct conveyances between married parties were never encouraged, and, though sometimes sustained in equity, in law they were always refused recognition because of the unity of husband and wife. To avoid this objection, consequently, it was the almost invariable rule to have such deeds made through the intervention of a trustee, and the statute was drawn, not to prevent or discourage what had been allowed time out of mind, Hunt v. Johnson, 44 N. Y., 27, but to prevent a construction which would sanction such. direct conveyances. Its very exception, as it were, explicitly declares that only conveyances direct from the husband to the wife shall not receive the benefit of its favor. The primary purpose of these acts was to enable every feme covert to hold property in her own right without the intervention of trusts or marriage settlements. Owen v. Cawley, 36 N. Y., 603; Wilbur v. Fradenburgh, 52 Barb., 478. The object of the statute was remedial, as expressed in the very title of the act, to remove the disability which attaches to coverture, and should have a liberal construction. Darby v. Callaghan, 16 N. Y., 79. But this should be a construction liberal for the one sought to be benefited, not for him who seeks to turn the phraseology of the law, by a liberal construction, in his own favor, to defeat conveyances to wives ; and so far as such a one is concerned, so far as the construction to be placed on the exception, the words “ from any person other than her husband,” the law should be construed strietissime. It is the duty of the courts, when the intention of the legislature is apparent, to see that the design and object of the statute is not evaded by construction, but, on the contrary, is permitted to have full effect and operation. Hurd v. Cass, 9 Barb., 366.
If, then, the will of the testatrix as to this real estate was made under sanction of the law, had the husband any right to an estate as tenant by the curtesy of which she could deprive him by the execution of the will? There is no question but what, in the absence of a testamentary disposition by her of her property, the right of tenancy by the curtesy survives in this state, notwithstanding the enabling acts relative to married women. Hatfield v. Sneden, 54 N. Y., 280. But the contestant maintains that he *135 had a vested right in this property on the birth of issue which could,not be disturbed by statute; that the married woman’s acts can have no application to those who contracted the relation of marriage, and had issue born to them, before those acts; and he declares that an examination of all the cases reported in this state will fail to show in a single case that issue was born prior to the passage of the act. It is true that the reports fail in this particular, but counsel for the executor has called my attention to the very important case of Thurber v. Townsend, and the fact that the papers on file in that case, as well as the defendant’s points, disclose-that a child was born about 1837. The importance of this case, in view of the objection of the contestant, Mr. Curtis, warrants my giving its particulars as it appears in 22 N. Y., 517. The syllabus of the case recites that “ the acts of 1848 and 1849, to protect the rights of married women, are not liable to objection as impairing the obligations of a contract because they defeat the expectation which the father of a living child had, previous to those acts, of being tenant in curtesy in lands acquired by his wife during coverture, and subsequent to those acts.’’ This was an action in ejectment in the mayor’s court of the city of Albany by Margaret Thurber, a married woman, and another, not her husband. Upon the trial it was proved that the plaintiff, Mrs. Thurber, married in 1833, and had a daughter, the issue of said marriage, who was living at the time of the trial, as was her father. The land in question came to Mrs. Thurber by descent in 1854. The defendant, for the purpose of upholding a lease made by Mrs. Thurber's husband, asked the court to charge the jury that Mr. Thurber, by his marriage and the birth of a child, acquired an estate by the curtesy in the lands of his wife which could not be defeated by the legislature. The court charged to the contrary, and the defendant excepted, The jury found for the plaintiff. On appeal, this judgment of the mayor’s court was affirmed by the general term of the fourth district on all questions of law, and by the court of appeals in all respects.
In Sleight v. Read, 18 Barb., 159, in the general term of the first district, Judge Gierke, referring to the acts of 1848 and 1849, asks: “ What were the rights which actually vested in the husband previous to their enactment ? ” and presents the following cogent summary of the law: “In regard to the real property belonging to the wife at the time of her marriage, he took a vested interest, and became at once entitled to the rents and profits during their joint lives, and, in the event of a birth of a living child, to a contingent right on the death of his wife to the sole enjoyment of the estate during his life, but as to any of her future acquisitions the nature and extent of his interest were subject to any change which the legislature might thereafter make in the laws relating to the acquisition, disposition and .enjoyment of property. All regulations of this kind, the rules of inheritance, the rules relating to wills, successions and conveyances, and all provisions by which the transmission of property is either directed or intercepted, are the offspring of law, and entirely dependent on the legislative power.” Any person, *136 therefore, whatever may be his prospective “possible rights arising from existing legislation in regard to property not yet vested in him, is liable to have them abridged or altogether revoked by any further legislation, whether such person is heir apparent, heir presumptive, or stands in the relation of a husband whose wife may at any time afterwards become entitled to property. The marriage contract does not imply that the husband shall have the same interest in the future acquisitions of the wife that the law gives him in the property she possesses at the time of the marriage, but that he shall have whatever interest, if any, which the legislature, before she is invested with them, may think proper to prescribe. This is precisely the contract to which Mr. B. and Mr. A. were respectively parties at the time of their respective marriages, and this contract, or the obligations to enforce it, has certainly not been impaired by the laws of 1849. Mrs. Bishop and Mrs Alexander married previous to the death of their father, from whom this property descended, and previous to the enactment of this statute. Instead of the law which existed at the time of their marriage, giving the husband a right to the rents and profits during the joint lives of the husband and wife, the legislature in its wisdom, or at all events in the legitimate exercise of its power, deemed it proper to enact that all future property descended to the wife should be transmitted to her to her sole and separate use, and that she should hold the rents, issues and profits thereof in the same manner, and with the like effect, as if she were unmarried. This was, in effect, a modification of the law of inheritance entirely within the control and direction of the legislative power. This modification does not operate on a marriage contract made before its passage, so as to be within the scope of the provision of the United State constitution prohibiting to the states the passage of laws impairing the obligations of contracts, because, as I have shown, the interest of the husband in the future acquisitions of the wife is subject to the power of the legislature in controlling and directing the acquisition of property, and this contingency was an ingredient of the marriage contract.” And so, too, it was held in Blood v. Humphrey, 17 Barb., 660, by Judge Mason, in commenting on this law: “Neither does this act conflict with any provision of our state constitution so far as the property in question is concerned. The legislature may qualify the wife to hold and convey property without in any manner depriving the husband of any of his property, and without impairing any of his rights of property; and, besides, all of these relations of after-acquired property are wholly dependent upon the municipal law, and do not rest in any manner upon any contract, express or implied, between the parties.” An interesting case in connection with this subject is that of Kelly v. McCarthy, 3 Bradf., 7, in which the learned surrogate discusses the contract of marriage with reference to the questions arising out of it regarding the lex loci contractus and the lex loci domicilii, and says: “ With regard to most, if not all, of them, the weight of authority is in favor *137 of the lex loci domicilii over the lex loci contractus, and on the obvious ground that there are many incidents of marriage not the subject of express contract, but flowing from municipal regulation, and dependent, therefore, except as to vested rights in property, upon municipal regulation for their continuance. Vested rights in the property of the wife already acquired under the law regulating the marriage contract cannot, of course, be disturbed by an alteration of that law; but it is quite a different thing to modify the law as to the incidents of marriage in respect to property to be acquired after the change of the law.” For these reasons we entertain no doubt that Mr. Curtis has not a life estate in the real estate of his wife as tenant by curtesy. See, also, Cooley Const. Lim., 360-362; Schouler Husb. & Wife, § 213; Ransom v. Nichols, 22 N. Y., 110; Moore v. City of New York, 8 id., 110; Holliday v. McMillan, 79 N. C., 315; Dunn v. Sargent, 101 Mass., 336; Hill v. Chambers, 30 Mich., 422; In re Clark, 40 Hun, 237; Southard v. Plummer, 36 Me., 64.
(2) We come now to the consideration of Mr. Curtis’ second objection, namely, that, as the husband of the deceased by his marriage to her in the year 1832, he is entitled to receive the whole of her personal estate after the payment of her debts and funeral expenses. And at the very threshold of the inquiry we must admit that the principle for which he contends is correct, with this restriction: that it should apply only to such personal property as Mrs. Curtis received before the said laws of 1848 ana 1849, because, as to all personal property which she receives .after the married women’s acts went into operation, by the force of those very statutes a testamentary disposition of such personal property by his wife ended all possible claim by him to it. The question has been before the highest court of the state, and it has been repeatedly determined that the husband has a vested interest, as to the personalty acquired by his wife before the acts, of which he cannot be deprived by legislation. Westervelt v. Gregg, 12 N. Y., 205; Barnes v. Underwood, 47 id., 351; Ransom v. Nichols, 22 id., 110; Robins v. McClure, 100 id., 328. But there is no proof before me that the personal property left by Mrs. Curtis was acquired by her prior to the 'statutes of 1848 and 1849. The testimony relative to what property Mrs. Curtis had at the time of her marriage, or at later periods during her married life, was given by her husband, who said that at the time of their marriage she had some property, “ but not what we would call nowadays considerable. I can tell you very nearly the amount of property, I think. The amount of property my wife received from her father’s estate, from the personal estate, was less than $9,000, and subsequently a piece of real estate was sold, which was about four thousand; about 813,000. The amount received from her mother’s estate was $15,000; say about $28,000 in the aggregate. And she had at the time her death personal property, one item of property for which she paid $30,000, which is in the Hew York Central railroad.” This is all the testimony in the case relating to the personal estate of the deceased, except the language of the testatrix herself in *138 her will, in which she says: “All the rest of my personal property owned by me absolutely, amounting now to about $26,000,” etc.; and I cannot indulge the presumption that the personal estate actually left by deceased is a part or the whole of that which her husband testified she received from the estate of her father or mother.
(3) Having determined the objections raised by Mr. Curtis, it is proper to turn to those presented by his daughters, Clara Isabelle Curtis and Julia Frances Munson. They are five in number, but, excepting the fifth, they may all be condensed, substantially, in the single one, namely, that these ladies object to the bequest to their use of the residue of the personalty, contained in the fourth item of the will of their mother, being diminished or impaired by the payment out of that fund of that portion of the mother’s debts, namely, the taxes, assessments, or the liens or .incumbrances which existed on the real estate at the time of their mother’s death; that by the will a distinct trust of the real estate was created; and that all liens and charges against said real estate, and all expenses and disbursements incurred by the executor in regard thereto, should be paid out of the proceeds of the sale thereof; and, consequently, that the block of railroad stock of which mention has been made should be held subject to the trusts as to personal property created in said will. As to the fifth objection raised by them, namely, that certain legacies should be paid out of the proceeds of the realty, it is sufficient to say that it must have been made under a misapprehension on the part of the objectors, for the will explicitly provides that the legacies to Elizabeth S. Higgins and Eliza Fitzpatrick should be paid out of the proceeds of the sale of the real estate. This question, then, of the daughters involves a criticism of the character of the several bequests, and an interpretation of the language of the will of the testatrix. And at the very outset of the inquiry, looking at the will in its entirety, regarding the bequests that were imposed on the realty by the third and fifth items of the will, namely: First, by the foundation of an annuity from the proceeds of the sale of the real estate in favor of her husband; and, second, by the fact that the said legacies to Elizabeth S. Higgins and Eliza Fitzpatrick are to „be paid out of the same proceeds, in connection with the fact that a power of sale was given to the executor, which power he has exercised, we are lead to the conclusion that there has been an equitable conversion of the realty into personalty for all the purposes of the will. White v. Howard, 46 N. Y., 162; Van Vechten v. Keator, 63 id., 52; Glacius v. Fogel, 88 id., 434; Lent v. Howard, 89 id., 169; Hobson v. Hale, 95 id., 588; Chamberlain v. Taylor, 105 id., 185; 7 St. Rep., 517; Asche v. Asche, 113 N. Y., 235; 22 St. Rep., 799.
But this equitable conversion cannot have the effect, as suggested by the learned counsel for decedent’s daughters, of causing all of the property, both real and personal, left by the testatrix to pass under the trust created by the fourth item of the will; indeed, in the view I entertain of the will, it cannot now make any .material difference whether or not there was an equitable conversion *139 to any of the parties interested. In case of an. equitable conversion the executor has, by virtue of his office, the administration of both kinds of property, real and personal, and should account for all as assets. This the executor is, in fact, doing, and he now brings the entire estate into court for distribution. Erwin v. Loper, 43 N. Y., 525.
But if we may regard the entire estate as personalty, how is it then relative to the provisions of the will? We may then regard all the provisions contained in it technically as bequests, and so let us see how they stand with reference to each other. The first, third, fifth and sixth items are what are termed “specific bequests,” and the fourth and seventh items'are “general bequests.” Now, it is an indisputable rule that chattels specifically bequeathed cannot be sold for the payment of general legacies, and can be sold for the payment of debts only after the other assets not specifically bequeathed have been applied. Stall v. Wilbur, 77 N. Y., 158. Another rule is that when the personal assets not specifically bequeathed are insufficient to pay all the debts, then the specific legacies must abate or* contribute in proportion to the value of their individual legacies. 2 Williams Ex’rs, 1372. In other words, though general legacies be swallowed up, it is only when the residuary and other legacies have been sacrificed, and nothing remains of the personal estate for satisfying legal debts and charges but what was specifically bequeathed, that specific and demonstrative legacies can be compelled to contribute for the deficiency. The question becomes important, considering the fact that, at the time of the death of the testatrix, the taxes and assessments resting on her real estate amounted, with interest, to the great sum of $36,611.65. Who shall bear this great load ? Shall it be deducted from the proceeds of the real estate, or shall it be paid out of the personalty? And, primarily, shall the residuum bequeathed by the fourth item of the will be devoted as far as it will go to that purpose, although it exhausts the entire fund passing under this item, which, as we have seen, amounts by the inventory to about $28,500? Í was at one time inclined to regard this fourth item as a specific bequest, moved by the tendency of some modern decisions, Woodworth’s Estate, 31 Cal., 595; Warley v. Warley, Bailey’s Eq., 397; Godard v. Wagner, 2 Strob. Eq., 1; In re Beckett, 15 St. Rep., 717, and so cast the burden of this mass of indebtedness proportionally on all the specific legacies; but greater study of the will leads me to the conclusion that the solution of the problem is to be found in the instrument itself. No light is to be obtained from the instruction in the second item of the will to the executors to pay all the debts of the testatrix and funeral expenses. Lord Chancellor Campbell says with reference to such directions: “ I will not say that the words here relied on are mere words of style, like the pious phrases with which the wills usually begin, but they do not seem to me to show that the testator had in mind the option given him of making the debt fall on' the mortgaged land or on the personal estate.’’ Nor does the statute, Rev. Stat., part 2, chap. 6, tit. 3, art. 2, § 27, preferring the pay *140 ment of taxes, etc., by administrators and executors, necessitate their payment out of the personalty in the face of a contrary direction to be found in a will, the estate being solvent. What does the will in question say, expressly or by implication ? And in this interpretation of the will we should bear in mind that the canons of construction of wills are more liberal than those of contracts. The intention of the testator is the great guide, subject, of course, to this: that this intention be agreeable to the rules of law. It has been called the “ polar star ” by which the court should be guided, and though Redfield dislikes the expression as being too fanciful, nevertheless the whole learned treatise on the construction of wills points to innumerable examples of the endeavor of courts to learn the purpose or intention of the testator. In Mann v. Mann, 14 Johns., 1, it is said that “ the rule in the construction of wills is that they be construed liberally and benignly, not technically. That construction will be most favored which will prevent a total failure of the bequest. This is the leading principle which runs through the cases cited upon this point. * * * It is the duty of courts to search for a construction that will carry the plain purpose of the testator’s bounty into effect.” Again: “The common law rule that the personal estate of a deceased person will be applied to the payment of his contract debts, to the relief of his real estate, is not, however, of universal application, and will not be enforced where it is in apparent hostility to' the plain intent of the deceased as expressed in his will, and would defeat bequests made therein.” Rice v. Harbeson, 63 N. Y., 493, and see Arcularius v. Geisenhainer, 3 Bradf., 72. Indeed, this humane principle of construction has been crystalized in a maxim, one of the oldest in the law, which comes to us even from the time of Bracton, and of the most frequent application in this very matter of the construction of wills, benigne faciendce sunt interpretationes chartarum ut res magis valeat quampereat.
Now, regarding the will in this beriign spirit, with a full view of everything within the four corners of the instrument, Hoxie v. Hoxie, 7 Paige, 192, what do we find? We are first struck by the manifest intention on the part of the testatrix to provide amply for her daughters, Miss Curtis and Mrs. Munson. Between them she divides all her jewels, silver, works of art and household goods; gives them equally a life-estate in all the rest of her personal property, and gives them for life the chief portion of the real estate. And, looked at more critically, we find that she uses the word “ proceeds ” in four parts of her will, namely, in the third, fourth, fifth and sixth items. The consideration we shall give to the third and fourth will be sufficient for all. The third item looks to the possibility of a sale of the realty during the lifetime of testatrix or after her death, in either of which events she provides “from the proceeds ” an annuity for her husband of $1,200. Now, in the ordinary business of life, what are the proceeds of a transaction with reference to those who are to be benefited by the outcome ? Evidently, the amount remaining after deducting the charges incidental to the *141 matter. If a title to real estate is to be closed, the grantee sees to it that all the taxes, assessments, or other liens are first deducted from the purchase price, and the remainder will generally be said to be the proceeds. Indeed, it is the net proceeds that the testatrix had in mind when the will was framed. This becomes still more evident when we consider the language of the fourth item of the will. In this she gives to her daughters’ use “ all the rest of my personal property, owned by me absolutely, amounting now to about $26,000, and except the proceeds of said plot of real estate.” The exception was made because there was, as we have seen, the possibility of the sale of the real estate during her life-time ; and. this very exception discloses that, though it might become personalty, still the fund of “ about $26,000 ” she determined should remain intact. Moreover, the testatrix announces about how much she expected this fund or residuum would be: about $26,000. Bear in mind that the vouchers filed herein show that at the time the will was made there were arrears of taxes and assessments already amounting to upwards of $10,000. If these were contemplated to be deducted from the personalty, she could not say “ about $26,000,” for there would not then have been that sum, but only about $16,000 for distribution. At the time of her death these unpaid taxes and assessments amounted, as we have seen, to more than $36,000; enough to far more than extinguish this legacy. Is it possible to entertain the idea that the testatrix intended to offer, as it were, Dead Sea fruit of bitterness and disappointment to the dearest objects of her benefactions ? The only fair and reasonable construction of this will seems to be to regard the word “proceeds ” as equivalent to “ net ” proceeds of the real estate. This will render the structure of the whole instrument harmonious, and will work no benefit to one part at the sacrifice of another. This is our conclusion, and so I have held that the personal property shall not be applied towards the payment of taxes and assessments on the real estate, and only to such debts of the testatrix as are not peculiarly incidental to the real estate.
(4) There remains for consideration but one question of minor importance respecting the amount involved, though the dispute is very earnest regarding it. It appears that the testatrix was, at the time of her death, the lessee of a house in Bridgeport, Gonn. The lease was for one year, from October 16, 1886, to October 16, 1887, for the rent charge of $420. The testatrix died there on Eovember 3, 1886. The testimony shows that her daughters, the contestants, continued to occupy the house from that time to the termination of the lease. The executor suggests in his account that the amount of the rent be charged against them. The landlord, Merritt Merwin, has, since this reference was ordered, assigned the claim for the entire rent to Miss Curtis, who now presents the claim and demands its payment. Some testimony was given by Mr. Curtis, who was called by the executor, that these ladies remained in the house “ at the special request of Mrs. Curtis, before her decease, that the children should remain there for the term for which she hired the house; ” but if by this evidence it was sought *142 to show that there was a donatio causa mortis of the outstanding term, it seems to me to be altogether insufficient. As I have deemed it within the jurisdiction of this court to determine the rights of these parties, I have set off against the probated claim of Miss Curtis, as assignee for the rent, the relative value of the-premises, at the same rate ($420 per annum) for the period of time for which she and her sister occupied them.